MONCIE RASMUS, JR., AND MARIE RASMUS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Rasmus v. Commissioner
Docket No. 9802-79.
United States Tax Court
T.C. Memo 1984-8; 1984 Tax Ct. Memo LEXIS 664; 47 T.C.M. (CCH) 829; T.C.M. (RIA) 84008; January 4, 1984. *664 Held: (1) Petitioner received unreported income during 1975 and 1976; and (2) petitioner is liable for additions to tax under sec. 6653(a), I.R.C. 1954. Weldon H. Berry, for the petitioners. Eddie L. Gibson, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax in the following amounts: Sec. 6653(a) [1]
Year
Deficiency
Addition
1975
$6,613.67
$330.68
1976
4,863.94
243.19
After concessions by the parties, the issues for decision are: (1) Whether petitioners received unreported income during the years at issue as determined by respondent; and (2) whether petitioners are liable for additions to tax under section 6653(a). FINDINGS OF FACTS Petitioners resided in Houston, Texas, at the time their petition was filed. Petitioner Moncie Rasmus, Jr. (hereinafter petitioner), was a self-employed attorney during the years at issue. He used the cash receipts and disbursements method *665 of reporting income and expenses in his law practice. On April 24, 1975, Mrs. Jessie H. Dudley died at Houston, Texas. Her will appointed petitioner as Independent Executor of her estate. The sole beneficiary under the will was Mrs. Dudley's niece, Vivian Davis. [2] Petitioner, as executor, commenced administration of the estate on May 9, 1975, by filing an application for probate of the will. In that application, petitioner indicated that the value of the estate was approximately $20,000. During 1975 and 1976, petitioner withdrew substantial sums of money from the estate's bank account and deposited them into his personal checking accounts in the Texas Commerce Bank and the Bank of the Southwest. Petitioner transferred a total of $26,500 of estate funds in 1975 and $13,560 in 1976 to his personal accounts. Petitioner did not execute a note or loan agreement for these amounts, did not indicate on the checks that they constituted loans, or in any other way indicate in estate documents or elsewhere that the witndrawal of these amounts from the estate's *666 account constituted loans. Petitioner did not pay interest for these amounts to the estate, and he did not repay any of the money during 1975 or 1976. Petitioner had complete control over his personal checking accounts during 1975 and 1976. The amounts transferred from the estate to petitioner were used by petitioner for his own and his wife's personal benefit. On April 13, 1977, petitioner had a cashier's check in the amount of $20,000 issued at the Texas Commerce Bank to Vivian E. Davis, the beneficiary under the will. The source of the funds for this check was a combination of money from petitioner's personal account and money from the estate's account. After being advised by petitioner that this check settled the estate and that there was no further cash to be distributed, the beneficiary filed in the Probate Court a Motion to Require Bond and Accounting on May 9, 1978, believing that there was a substantial amount of cash yet to be accounted for. Petitioner thereafter filed an Accounting [3] which indicated that, with respect to a gross estate of approximately $120,000, [4] $32,591.96 was being withheld by petitioner as "fees." The Accounting further indicated that a total *667 of $20,592.51 in estate debts and been paid by petitioner. The beneficiary then filed with the Probate Court an Application to Determine Fees, claiming that the amount withheld by petitioner was excessive. In the ensuing litigation, petitioner contended that the amount retained as fees was pursuant to an agreement with his attorney to pay him for work as attorney of record of the estate. On January 12, 1979, the Probate Court ordered that the proper sum for fees for all services rendered by petitioner as Independent Executor and/or attorney and by his attorney was $5,000. [5] The Texas Court of Civil Appeals affirmed on June 21, 1979. *668 Petitioner's motion for rehearing was denied on February 29, 1980, and petitioner saw that a cashier's check at the Texas Commerce Bank was issued to the beneficiary on October 24, 1980, in the amount of $27,591.96. The source of the funds for that check was in part the estate's money and in part money from petitioner's account. In the course of auditing petitioner's returns for 1975 and 1976, respondent calculated petitioner's income under the bank deposits method. In his notice of deficiency, respondent determined that petitioner's bank deposits indicated unreported income for the years 1975 and 1976 in amounts that are very nearly the same as the amounts of estate funds deposited into petitioner's personal accounts during 1975 and 1976. [6]
OPINION Respondent's position *669 is that petitioner received the estate money under a claim of right and without restriction as to its disposition, thereby receiving income under North American Oil Consolidated v. Burnet,286 U.S. 417 (1932). Petitioner claims that deposits of estate funds to his accounts constituted loans from the estate to himself, which are not subject to the claim of right doctrine. He also contends that the portion of the estate funds retained by him as "fees" was properly so held pending the outcome of litigation to determine the reasonableness of the amount. The law is quite clear that: When a taxpayer acquires earnings, lawfully or unlawfully, without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition, "he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." [James v. United States, 366U.S. 213, 219 (1961) (quoting North American Oil Consolidated v. Burnet,286 U.S. at 424.)] In United States v. Rochelle,384 F.2d 748, 751 (5th Cir. 1967), *670 the Fifth Circuit noted that the "economic benefit accruing to the taxpayer is the controlling factor in determining whether a gain is 'income.'" Thus, that court concluded, A loan does not in itself constitute income to the borrower, because whatever temporary economic benefit he derives from the use of the funds is offset by the corresponding obligation to repay them. See James v. United States, supra 266 U.S. at 219, 81 S.Ct. at 1055. Where the loans are obtained by fraud, and where it is apparent that the recipient recognizes no obligation to repay, the transaction becomes a "wrongful appropriation [and comes] within the broad sweep of 'gross income'". Ibid.[384 F.2d at 751.] See Bradley v. Commissioner,57 T.C. 1, 7 (1971). Thus, the mere fact that the transaction is termed a "loan" does not provide a means for a taxpayer to escape taxaction by cloaking an unlawful scheme in the guise of a loan. The existence of a loan depends not upon conclusory claims but upon whether the parties who entered into the transaction in fact intended that the money advanced by repaid. Moore v. United States,412 F.2d 974 (5th Cir. 1969); *671 Commissioner v. Makransky,321 F.2d 598 (3d Cir. 1963), affg. 36 T.C. 446 (1961). There is no dispute that petitioner transferred estate funds to his own accounts or that he had during the years at issue unrestricted use of estate funds that he had transferred to his personal accounts. His burden here thus is to show that during those years he recognized an obligation to repay the funds to the estate and in fact intended to repay them. Rule 142(a), Tax Court Rules of Practice and Procedure; Commissioner v. Makransky,supra.
We think that petitioner has failed to meet his burden. His conduct was wholly inconsistent with the holding of funds for another intending to return them. Tangible evidence of a loan is completely lacking. As an executor, petitioner had a duty under State law to maintain books to account for income to and expenses paid from the estate. Walling v. Hubbard,389 S.W. 2d 581, 589 (Tex. Civ. App. 1965). There was no loan agreement, note or other evidence documenting the existence of a loan. The estate's checks to petitioner did not contain a notation as to their purpose. There is no indication *672 that the beneficiaries were otherwise aware that part of the estate's funds had been transferred to petitioner's personal accounts. In Moore v. United States,supra, the taxpayer had devised a complicated scheme whereby finance companies had purchased notes that had been fraudulently obtained by taxpayer from third parties. The Fifth Circuit (the Circuit to which an appeal in the instant case would lie) rejected the taxpayer's claim that in effect there were loan agreements between him and the finance companies, evidenced by the fact that he had been making payments on the notes to the third parties who in turn paid the finance companies. The court found: Though he made regular payments and may have intended that one day the finance companies would be reimbursed in full, we cannot say that the good intention of a swindler whose identity is unknown to the party from whom the money is being obtained is the same in law and in fact as a consensual loan arrangement between two parties. * * * * * * The absence of a consensual agreement between the party providing the money and the party receiving it is fatal to the [taxpayer's] contention that the money should *673 be excluded from gross income on a loan theory. [412 F.2d at 979 and 980.] Where, as here, the beneficiary did not even know that money to which she would be entitled upon completion of the estate's administration had been appropriated by petitioner, that appropriation cannot, under the rule of Moore, be termed a loan. Moreover, under State law an independent executor is held to the same fiduciary standards in his administration of the estate as a trustee. Humane Society of Austin and Travis County v. Austin National Bank,531 S.W. 2d 574, 577 (Tex. 1975), cert. denied 425 U.S. 976 (1976). [7] The Texas Trust Act provides that a (noncorporate) trustee may not lend trust funds to himself, or to his relative, employer, employee, partner, or other business associate. Tex. Rev. Civ. Stat. Ann., art. 7425b-10 (Vernon 1982). In Texas, the mingling of trust funds with the trustee's own and use of those funds in the trustee's private business is a clear breach of trust. Langford v. Shamburger,392 F.2d 939, 942 (5th Cir. 1968). Thus, even if petitioner had intended merely to borrow the money, petitioner violated his *674 trust by the very existence of such a loan and by making personal use of the estate's money. But he went even further. Petitioner testified that he did not pay interest on the purported loan. Certainly, at least this aspect of the transaction constituted a permanent appropriation of estate money, since the interest that could have been accruing on the $40,060 over the years if it had remained in the estate's account was taken and used by petitioner and never was intended to be paid back. This draws into serious question the credibility of petitioner's bare testimony that he was merely borrowing the estate's money. See South Texas Rice Warehouse Co. v. Commissioner,366 F.2d 890, 898 (5th Cir. 1966), cert. denied 386 U.S. 1016 (1967). Petitioner at trial and on brief shrugged off this clear betrayal of his trust by claiming that he as an independent administrator was "free from judicial *675 interference or intermeddling" and thus could do as he pleased with the estate's money, including placing all of it in his own account. This is an incorrect description of Texas law. An independent executor has the same responsibilities and duties as an executor under the direction of the Probate Court; he remains an officer of the Probate Court. Gambill v. Mathes,490 S.W. 2d 863, 865 (Tex. Civ. App. 1973); Walling v. Hubbard,supra at 590. The purpose of independent administration is merely to free the estate of onerous and expensive judicial supervision. In Re Estate of Bateman,528 S.W. 2d 86, 88 (Tex. Civ. App. 1975). There is no indication in either the Texas statutes or cases that an independent administrator has carte blanche to do as he wishes with estate funds.Petitioner's fiduciary duty thus was no different from that of an ordinary executor or trustee merely because he was an independent executor. Moreover, petitioner is an attorney. As a man of legal training, petitioner must have been aware of his fiduciary duty and his obligation to maintain records.These flagrant and intentional violations of his duties here *676 are such blatant evidence of bad faith that petitioner's mere testimony that there was a loan is insufficient to meet his burden of proof. Nor does the fact that the money actually was paid back after the years at issue satisfy petitioner's burden of proving that it was his intent to borrow the money during the years at issue. In Leaf v. Commissioner,33 T.C. 1093 (1960), the taxpayer had fraudulently transferred to his own use property of his own corporation in contemplation of bankruptcy. Some of the money was repaid during the year at issue, some was repaid in a later year, and some was never repaid. In rejecting taxpayer's claims that the withdrawals were loans that had been partially paid back, we stated: In 1952, petitioner diverted funds, which would otherwise have been available to creditors of his wholly owned corporation, to his own use and benefit. The fact that these diversions were labeled "loans" on checks drawn by petitioner against the corporation's bank account and on its books is not conclusive of their true character in the absence of any evidence of an intention to make repayment at the time of the taking. While it is true that petitioner *677 had an obligation to restore the funds diverted, and did make partial restitution, that obligation arose from his unlawful appropriation to his own use and benefit of funds of his insolvent corporation with the intention of defrauding creditors. The fact that he had such obligation and that subsequent to 1952 he returned a portion of the diverted funds in no way affects his liability for taxes on the funds diverted and not returned to the corporation or its creditors in 1952 * * *. Petitioner had such control over them in 1952 that they represented taxable income to him for that year. [33 T.C. at 1096.] The evidence here does not reveal petitioner's motive in returning the money. For example, while part of the 1977 payment of $20,000 to the beneficiary may have been made because petitioner was returning money that he had intended to return all along, [8] it is equally possible that such money was paid because petitioner was concerned in 1977 that his earlier appropriation of estate funds had been or would be detected. Given the extremely dubious nature of the transactions here, the evidence is inconclusive at best. With regard to the $27,591.96 paid in 1980, there *678 is no dispute that petitioner held that amount--plus an additional $5,000--under a claim of right, for "fees," until the fee dispute was resolved in 1980. While petitioner has testified that he intended to pay that sum over to his attorney, the facts simply do not support that statement. There was no written obligation to pay that amount to his attorney. [9] Moreover, the estate was not a legally complex one, so that an attorney's fee of such a large sum was thoroughly unwarranted. [10] There also is reason to believe that most of the services for which fees were claimed were performed by petitioner. As the Court of Appeals noted in affirming the fee award of $5,000: Although the appellant's position is that Mr. Berry was the attorney for the estate, the trial court was entitled to conclude from the evidence that Mr. Rasmus performed all of the services listed in Exhibit RX1 and that an executor who was not an attorney could have rendered many of them. Therefore, it is quite clear that the amount retained as "fees" was not intended to be a loan. *679 Finally, petitioner claims that he must have intended to return the estate funds allegedly borrowed because he had an obligation as independent executor to file an accounting, listing the assets of the estate, as well as other public documents, and thus could not have intended to keep the money. There are two significant reasons why we are not persuaded by this argument. First, petitioner could have intended during the years at issue to file false public papers--he in fact did as much in the Accounting filed with the Probate Court by neglecting to indicate thereon that he had transferred a substantial amount of cash belonging to the estate to his own account, and by showing an exorbitant amount as "fees." [11] Petitioner also had filed an apparently false application for probate during 1975, which indicated that the approximate value of the estate was only $20,000, when it clearly was substantially in excess of that amount. The Accounting indicated a gross estate of approximately $120,000 and debts of about $20,000, leaving a net estate of approximately $100,000. The substantial underestimation of the net value of the estate at this early date looks suspiciously as though petitioner *680 was setting the stage for a permanent appropriation of estate money to his own use. Second, petitioner could have intended not to comply with his duty to file an Accounting at all. When he sent the $20,000 check to the beneficiary in 1977, there was no indication that he planned to file an Accounting. It was not until the beneficiary demanded one in the Probate Court that an Accounting was filed. Given the blatant violations of fiduciary duty that occurred here, which we already have discussed, it seems quite likely that petitioner did not plan to reveal his retention of estate funds until pressed. While all of these possibilities are, of course speculation, they show that petitioner has failed to demonstrate the existence of a loan merely by claiming that an unlawful appropriation of estate funds could have been discovered by an examination of public documents. *681 Therefore, petitioner has failed to provide any persuasive evidence to corroborate his testimony that he intended during the years at issue to repay any of the funds to the estate. We are not bound by conclusory statements of witness. [12] We thus must conclude that petitioner deposited the estate money into his own accounts and unlawfully held it there during the years at issue under a claim of right. Petitioner therefore should have reported the amounts deposited as income in the years of deposit. See James v. United States,366 U.S. 213, 225-226 (1961) (gains acquired by unlawful means are taxable). The final issue for decision is whether petitioner is liable for additions to tax under section 6653(a) for negligence or intentional disregard of rules and regulations.Petitioner bears the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure; Estate of Mason v. Commissioner,64 T.C. 651 (1975); Bixby v. Commissioner,58 T.C. 757 (1972). We have held *682 that, because petitioner did not prove that he intended during the years at issue to return the money taken from the estate, the transfer of estate funds to his account was income. In failing to report that income on his 1975 and 1976 returns, he exhibited an intentional disregard of rules and regulations. Petitioner offered no credible evidence to justify his failure to report these amounts on his returns or to rebut respondent's determination in the notice of deficiency. Therefore, we conclude that petitioner is liable for the additions to tax under section 6653(a). Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. Mrs. Dudley's husband, who predeceased her within a few weeks, was entitled to part of the estate until his death.↩
3. While not exactly a model of clarity, the Accounting appears to contain a summary of the estate's assets, including those which already had been distributed, as well as numerical figures, presumably representing the value of each asset. It is unclear from the evidence what became of several items which apparently had not been distributed to the beneficiary, but those items are not in issue here. ↩
4. Petitioner's Accounting appears to state that the value of the gross estate was $120,092.70. Our gross estate figure (calculated by adding the values of the assets listed on the Accounting) was $119,347.97. ↩
5. Three thousand dollars of this amount was for attorney's fees, and $2,000 was for executor's fees.↩
6. For 1975, the notice determined an increase in petitioner's taxable income of $26,476.92, while checks of estate funds to petitioner that year were a total of $26,500. For 1976, the notice figure was $13,369.22, while estate checks to petitioner were $13,560. We do not know the reasons for these discrepancies but, since they both operate in petitioner's favor, we attach no significance to them.↩
7. The Texas Probate Code provides that the executor or administrator "shall recover possession of and hold such estate in trust to be disposed of in accordance with law." (Emphasis added.) Tex. Prob. Code Ann., sec. 37↩ (Vernon 1980).
8. The evidence shows only that the sources of the $20,000 payment were both the estate's account and petitioner's account. Thus, even assuming that the $40,060 of the estate's money in petitioner's personal account was borrowed, clearly not all of that $20,000 payment constituted a repayment of the loan. Since petitioner claimed thereafter to be retaining more than $32,000 as fees, it seems likely that at best only $8,000 of that $20,000 could have been repayment of a loan. ↩
9. There is no evidence in the record other than petitioner's testimony that any money actually was paid to the attorney after the fee litigation was concluded. Petitioner testified that the attorney fees portion of the award ($3,000) was paid in cash, so that no canceled checks could be produced. ↩
10. While the trial court in the fee dispute case had not rendered findings of fact, the Court of Appeals presumed from the trial court's order awarding fees that, "1) if the estimates of time spent are correct, the appellant [and his attorney] overproduced, 2) many of the services listed are those for which an executor is compensated by his commissions, and 3) the estate was not a complex one."↩
11. We also note that petitioner did not have a right under Texas law to retain estate funds to pay attorney's fees at some future time. There are two methods by which an attorney can recoup payment for services rendered to an estate: (1) He can obtain an award after filing a formal claim under the Texas Probate Code; or (2) the administrator may pay the attorney with his own funds and then later present a request for reimbursement from the estate. Dumitrov v. Hitt,601 S.W. 2d 472, 473 (Tex. Civ. App. 1980).Moreover, with regard to petitioner's assertion that he had an oral contract to pay his lawyer the amount retained as "fees," an executor does not have the authority to bind the estate for legal services, since the attorney can only recover fees that are reasonable. Neblett v. Butler,162 S.W. 2d 458, 461↩ (Tex. Civ. App. 1942).
12. See South Texas Rice Warehouse Co. v. Commissioner,366 F.2d 890, 898 (5th Cir. 1966), cert. denied 386 U.S. 1016↩ (1967).