T.C. Memo. 1999-9


UNITED STATES TAX COURT


FERYDOUN AHADPOUR, A.K.A. F. AHADPOUR, AND
DORIS AHADPOUR, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 4843-96.                    Filed January 21, 1999.


<u>William K. Norman</u> and <u>Edi Stiles</u>, for petitioners.

<u>Louis Jack</u> and <u>Elizabeth Stetson</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


NAMEROFF, <u>Special Trial Judge</u>:  This case was heard pursuant
to the provisions of section 7443A(b)(4) and Rules 180, 181, and
182.[1]  Respondent determined deficiencies in petitioners' Federal
income taxes, additions to tax, and penalties as follows:

---

[1]  All section references are to the Internal Revenue Code
in effect for the years at issue.  All Rule references are to the
Tax Court Rules of Practice and Procedure.

| Year | Deficiency | Addition to Tax Sec. 6651(a)(1) | Penalty Sec. 6662(a) |
|------|-----------|-----------------|------------------|
| 1989 | $1,363,638 | $340,560 | $272,728 |
| 1990 | 303,274 | -- | 60,655 |
| 1991 | 237,234 | 60,864 | 47,447 |

The issues in this case, Iranian bad debt and domestic issues, have been bifurcated for separate resolution. This opinion addresses the domestic issues.

After concessions by the parties,[2] the sole issue for decision is whether certain payments received by petitioners pursuant to a sale agreement for the sale of real property should be included in gross income in the year received.

This issue was submitted by the parties fully stipulated. This reference incorporates herein the stipulation of facts and attached exhibits. At the time they filed their petition, petitioners resided in Huntington Beach, California.

FINDINGS OF FACT

Sale Agreement

On November 1, 1989, Doris and Ferydoun Ahadpour as sellers entered into an "Agreement for Purchase and Sale of Real Property and Escrow Instructions" (Agreement) with buyer Coultrup

---

[2] The parties filed a Stipulation of Settled Issues with this Court on Apr. 17, 1998, resolving all domestic issues except for the issue before this Court. Furthermore, the parties agree that additions to tax under sec. 6651(a)(1) and accuracy-related penalties under sec. 6662(a) shall not apply to the domestic issues for all years at issue.

Development Co. (CDC). Pursuant to the Agreement, petitioners agreed to sell certain improved real property known as "Huntington Harbour Bay Club Phase II" (Phase II), with improvements thereon in the form of parking facilities, tennis courts, and a clubhouse with restaurant, catering, and bar facilities. This property is located in the City of Huntington Beach, in an area called Huntington Harbor near the Pacific Ocean.

CDC was planning a development project for Phase II. CDC had previously purchased Phase I, and the Phase I development project had already been approved for condominium development by the City of Huntington Beach.

The agreed-upon purchase price for Phase II was $7.5 million. The Agreement set forth a payment schedule. CDC was to pay $500,000 in cash during escrow: $75,000 as an "Initial Deposit" to be paid concurrently with the execution of the Agreement, and $425,000 as an "Additional Deposit" to be paid within 10 days thereafter. The Agreement provided: "Escrow Holder is hereby instructed to immediately release the Initial Deposit to Seller. The Initial Deposit is nonrefundable except in the case of Seller's breach of this Agreement, and is applicable to the Purchase Price." The Additional Deposit also was to be released immediately to petitioners and also was nonrefundable except in case of the sellers' breach and was

applicable to the purchase price.  An additional $5 million in cash was due at the closing of escrow with the remaining balance to be paid by a promissory note secured by a First Trust Deed. Furthermore, the Agreement provided that escrow was to close within 180 days of the time it opened.

The Agreement provided that if CDC needed more time to obtain government approval for the planned development, then escrow could be extended for an additional 120 days upon CDC's payment of an "Extension Payment" of $200,000.  The Extension Payment was also to be released immediately to petitioners.  This payment was nonrefundable and would be applied to the purchase price.

Section 6(c)(ii) of the Agreement provided:  "If close of Escrow fails to occur due to Seller's default hereunder, or for any reason other than a default by Buyer, Buyer shall be entitled, in addition to any legal or equitable remedies, to the immediate refund of the Deposit[3] and Extension Payment, if applicable."

Pursuant to section 6(f)(ii) of the Agreement, petitioners were required to deposit into escrow, no later than the business day immediately before the close of escrow, the deed conveying title to Phase II to CDC in fee simple.

---

[3] Deposit refers to both the Initial Deposit and the Additional Deposit.

The Agreement further provided that taxes, utility charges, and other expenses were to be prorated between the parties on a per diem basis as of the close of escrow.

Escrow Deposits

On November 2, 1989, pursuant to the Agreement, petitioners opened escrow No. 607137-JH with Chicago Title Insurance Co. as "Escrow Holder". The closing date for escrow was May 1, 1990. Also on November 2, CDC deposited a $75,000 cashier's check as the Initial Deposit referred to in the Agreement with Escrow Holder. On that same day, Escrow Holder released the $75,000 cashier's check to petitioners.

On November 7, 1989, petitioners purchased a certificate of deposit in the amount of $100,000. The funds used to purchase the certificate of deposit consisted of the $75,000 petitioners received from Escrow Holder and $25,000 from petitioners' personal checking account.

Pursuant to the Agreement, on November 17, 1989, CDC deposited the $425,000 Additional Deposit with Escrow Holder. On that same day, the $425,000 was released to petitioners by wire transfer to petitioners' personal account. Before the wire transfer of the Additional Deposit, the balance in the account was $118,420.13. On November 21, 1989, petitioners disbursed

$500,000 from their account and used this money to pay down the mortgage on their residence in Huntington Beach.

On May 2, 1990, CDC exercised their right to extend escrow and delivered the $200,000 Extension Payment to Escrow Holder. The closing date was extended until September 1, 1990. Escrow Holder released the $200,000 Extension Payment to petitioners by delivering a check to petitioners' attorney Mr. Jay Steinman (Mr. Steinman). Also on May 2, 1990, petitioners deposited the $200,000 into an account at Wells Fargo Bank held in the name "Huntington Harbour Bay and Racquet Club Marina Acct". The balance in this account immediately before the deposit was $35,214.02. On the same day, petitioners wrote a check from this account for $200,000 to purchase a certificate of deposit.[4]

Petitioners did not report the $500,000 received in 1989 and the $200,000 received in 1990 from Escrow Holder as income on their 1989 or 1990 tax return or on any subsequent returns.

Public Trust Land Problem

In April 1990, local Huntington Beach residents sued CDC and the City of Huntington Beach with respect to CDC's planned condominium development at the Huntington Harbour Bay Club Phase I. The lawsuit challenged, inter alia, the legality of "land use

---

[4] The record contains substantial additional evidence tracing petitioners' use of the funds received from the Escrow Holder. We believe that material is irrelevant to the issue. Suffice it to say that petitioners exercised dominion and control over these funds without restriction.

approvals" made by the City of Huntington Beach under the "General Plan" with respect to a zoning variance for Phase I of the project. The residents also contended that height restrictions were violated and that the project did not promote the general welfare of the neighborhood.

In a letter dated May 11, 1990, the attorney representing the residents wrote a letter to the deputy city attorney for Huntington Beach and the executive director of the California Coastal Commission to inform the parties that the condominium development project was in violation of the State of California's (State) public easement over patented tidelands.[5] Soon after, the State declared that the Phase I and II properties were located on tidelands and were subject to a public trust easement in favor of commerce, navigation, and fishing.

Because of the State's claim regarding the public easement, the closing of escrow was delayed. CDC requested that petitioners further extend escrow past the September 1, 1990, closing date. On September 5, 1990, Mr. Steinman referred the State's easement claim to First American Title Insurance Co. (First American) for resolution under petitioners' title insurance policy, which had been issued April 2, 1979.

---

[5] This letter also informed the parties that the development project violated the Alquist-Priolo Special Studies Act since the planned location of one of the buildings was directly over the trace of an active earthquake fault. Such a location is prohibited. This matter was resolved by CDC.

Around October 1990, petitioners and CDC began negotiating a "Third Amendment to Agreement for Purchase and Sale of Real Property and Escrow Instructions" (Third Amendment) in order to establish terms for a further extension of the Phase II escrow. During these negotiations, CDC was aware of the State's easement claim but wanted to ultimately close the Phase II escrow if the claim could be satisfactorily resolved. Also during this time, petitioners took the position that CDC had an unconditional obligation to purchase Phase II and the fact that the City of Huntington Beach refused to process CDC's application for Phase II development due to the State's claim was CDC's problem.

Many drafts of the Third Amendment went back and forth between the parties. Mr. Steinman prepared a final version of the Third Amendment dated June 11, 1991, which petitioners signed, but which was never signed or agreed to by CDC.

By letter dated July 22, 1991, Mr. Michael McCaffrey (Mr. McCaffrey), who was working with Mr. Steinman as petitioners' attorney, requested that First American provide petitioners with a $2 million interest-free loan because escrow for Phase II had not closed yet and petitioners were unable to make a required loan payment for certain real estate not relevant here. Mr. McCaffrey stated that First American had an obligation to indemnify petitioners for the title problem. On August 14, 1991, petitioners and First American entered into an agreement entitled

"Limited Agreement" pursuant to which First American would lend petitioners $600,000 interest free. The loan was secured by the Phase II property and was to be repaid out of the proceeds of its eventual sale.

By letter dated December 4, 1991, Mr. Steinman requested, inter alia, that First American advance up to $700,000 to petitioners. This amount would then be offered to CDC in order to terminate the Agreement and discharge CDC's claims under the Agreement. The loan was to be interest free and would be repaid with the proceeds from the eventual sale of Phase II. CDC was not aware of this request. On December 10, 1991, CDC notified Escrow Holder by letter that the parties wished to continue with the escrow and that they considered it still open.

Cancellation of Agreement

On January 31, 1992, after several weeks of negotiations between petitioners and First American, those parties executed an "Amendment to Limited Agreement" incorporating the matters discussed in Mr. Steinman's December 4, 1991, letter. Pursuant to the "Amendment to Limited Agreement", First American issued a cashier's check in the amount of $750,000 to petitioners so that they could pay CDC. This amount was added to petitioners' accumulated indebtedness to First American.

Since petitioners were unable to deliver title in fee simple to Phase II free of the cloud of the State's public easement

claim, petitioners and CDC decided to cancel escrow.  CDC agreed to accept $650,000 to terminate its rights under the Agreement. By letter dated February 4, 1992, Mr. Steinman informed Escrow Holder that petitioners and CDC agreed to cancel the Phase II escrow.  On February 14, 1992, petitioners and CDC signed a "Mutual Release" in which they agreed to terminate the sale of Phase II and to release each other from any causes of action relating to the Agreement.

Pursuant to the terms of the Mutual Release, the parties agreed that CDC would receive up to $650,000 from petitioners "as consideration" for executing the Mutual Release:  $600,000 to be paid at the signing of the Mutual Release and an "Additional Amount" of $50,000 to be paid upon, inter alia, the return of CDC's work product on the Phase II project.  On May 28, 1992, petitioners paid to CDC $42,500 of the Additional Amount. Petitioners retained $7,500 of the Additional Amount, which they considered to be an offset of CDC's share of the legal fees that petitioners had incurred as a result of the State's tidelands easement claim.[6]

On their 1992 tax return, petitioners did not claim a deduction for the $642,500 paid to CDC in 1992.  Petitioners also

---

[6]  The record contains a considerable amount of information pertaining to events that occurred between petitioners and the State, and petitioners and First American, after the years at issue.  We do not consider this information to be of any relevance to the years before the Court.

did not report as gross income on any tax return the $57,500 difference between the $700,000 they received from CDC under the Agreement during 1989 and 1990 and the $642,500 they paid to CDC pursuant to the Mutual Release in 1992.[7]

During this entire period, petitioners remained in possession of Phase II and retained all benefits and burdens of ownership including liability for payment of taxes and insurance. It does not appear from the record that CDC ever took possession of Phase II.

OPINION

Respondent contends that petitioners received the payments from Escrow Holder under a claim of right, without any restrictions on their use, and, therefore, the payments are included in income in the years of receipt.

Petitioners, on the other hand, contend that since escrow never closed and the sale was never consummated, the deposits made by CDC are not taxable to them. In the alternative,

---

[7] We do not have jurisdiction with regard to 1992. We make this finding of fact as to 1992 for completeness, but we draw no conclusions with respect to petitioners' tax liability for 1992 resulting from this transaction.

petitioners request that if it is determined that the amounts received are included in income (as if the sale had closed), then the amounts received should be reduced by all or part of the adjusted basis of the property and reported for Federal tax purposes under the installment method of reporting.

Gross income means all income from whatever source derived including gains derived from dealings in property. Sec. 61(a)(3). Gain from the sale of property had been held to be gross income in the year when the sale is consummated, and not in the year when the contract was executed. Veenstra & DeHaan Coal Co. v. Commissioner, 11 T.C. 964, 967 (1948). Under section 1001(a), gain from the sale or other disposition of property is the excess of the amount realized over the taxpayer's adjusted basis in the property.

For purposes of Federal income taxation, a sale occurs upon the transfer of benefits and burdens of ownership, rather than upon the satisfaction of the technical requirements for the passage of title under State law. Derr v. Commissioner, 77 T.C. 708, 723-724 (1981); Yelencsics v. Commissioner, 74 T.C. 1513, 1527 (1980). The question of when a sale is complete for Federal income tax purposes is essentially one of fact. Baird v. Commissioner, 68 T.C. 115, 124 (1977). The applicable test is a practical one that considers all of the facts and circumstances,

with no single fact controlling the outcome. Derr v. Commissioner, supra at 724; Baird v. Commissioner, supra at 124; Deyoe v. Commissioner, 66 T.C. 904, 910 (1976). Generally, a sale of real property is complete upon the earlier of the transfer of legal title or the practical assumption of the benefits and burdens of ownership. Derr v. Commissioner, supra at 724; Baird v. Commissioner, supra at 124; Deyoe v. Commissioner, supra at 910.

CDC did not receive the benefits and burdens of ownership of Phase II upon execution of the Agreement. There is no evidence that CDC ever had possession of Phase II. Furthermore, as stated in the Agreement, petitioners were still liable for the payment of taxes and insurance on Phase II until the closing of escrow. CDC did not have full legal title at the time the Agreement was executed. Under California law, delivery and acceptance of a deed passes full legal title. Cal. Civ. Code sec. 1056 (West 1982). According to the Agreement, petitioners were to retain the deed until no later than the business day preceding the close of escrow, at which time they were to deposit into escrow the deed conveying title to CDC in fee simple.

An earnest money deposit, received on the execution of a sales contract, is not income until the taxpayer acquires an unconditional right to retain the deposit. Bourne v.

Commissioner, 62 F.2d 648, 649 (4th Cir. 1933), affg. 23 B.T.A. 1287 (1931). If the sale is consummated, it fixes the seller's right to retain the deposit, and the earnest money is included as part of the sales proceeds. Kang v. Commissioner, T.C. Memo. 1993-601; Kellstedt v. Commissioner, T.C. Memo. 1986-435. If the sale is not consummated, the sales contract fixes the seller's right to retain the deposit, and the deposit is included in income at the time that the contract fixes the seller's right to retain the deposit. Baird v. United States, 65 F.2d 911, 912 (5th Cir. 1933). Because earnest money is in the nature of a payment for an option, it is included in the seller's ordinary income when forfeited to him. Sec. 1234; Elrod v. Commissioner, 87 T.C. 1046, 1068-1069 (1986); see Kang v. Commissioner, supra (taxpayers' rights to earnest money were not fixed before they refunded a portion of it; amount they kept was included in ordinary income in year they made refund, not year they received earnest money).

At the time the parties entered into the Agreement in 1989, they anticipated that the sale of Phase II would be consummated in 1990. At the time petitioners received the Initial Deposit and the Additional Deposit, they did not have an unconditional right to retain these deposits. The unconditional right to retain the deposits was to be fixed only after CDC paid the

remainder of the purchase price and when petitioners delivered the executed deed conveying title to Phase II in fee simple to CDC. If the sale was not consummated, section 6(c)(ii) of the Agreement fixed petitioners' right to retain the deposits only if CDC breached.

Respondent argues that the claim of right doctrine applies and the deposits received by petitioners should be included in their gross income in the year received. The Supreme Court case North Am. Oil Consol. v. Burnet, 286 U.S. 417 (1932), established the elements of the claim of right doctrine. The three basic elements are: (1) The taxpayer receives money or property, (2) under a claim of right, and (3) the taxpayer has control over the use or disposition of the money or property. Id. at 424. Amounts received under a claim of right, without restriction as to their disposition, are taxable when received even though the taxpayer may have a contingent obligation to restore the funds at some future point. Id.

It is clear that petitioners received the deposits to which they were entitled under the Agreement, and that they exercised control over the use and disposition of those deposits. However, we conclude that the claim of right doctrine does not apply to the instant case. Petitioners received the amounts pursuant to the Agreement for the sale of real property. Therefore, cases

pertaining to deposits taxpayers received before the consummation of a sale for real property are applicable to the case at hand rather than those involving the claim of right doctrine.

Respondent contends that, since the money was directly released to petitioners for their use, the amounts should be included in gross income when received. However, in Kang v. Commissioner, supra, the earnest money was deposited into the taxpayers' personal checking account.

Additionally, respondent contends that petitioners were under a contingent liability to repay the funds to CDC, and that to avoid application of the claim of right doctrine, the recipient must recognize in the year of receipt an existing and fixed obligation to repay the amount received and must make provisions for repayment. Hope v. Commissioner, 55 T.C. 1020, 1030 (1971), affd. 471 F.2d 738 (3d Cir. 1973). A restriction on the disposition or the use of the funds may also prevent the application of the claim of right doctrine. Commissioner v. Indianapolis Power & Light Co., 493 U.S. 203, 209 (1990).

We do not find that petitioners were merely under a contingent obligation to repay the deposits to CDC as respondent contends. There was an existing and fixed obligation for petitioners to repay the deposits in the event that they breached or "for any other reason other than a default by Buyer". Indeed,

petitioners did repay an amount close to the amount CDC deposited upon execution of the Mutual Release.  Petitioners did not have an unconditional right to retain the deposits.  Bourne v. Commissioner, supra at 649.

The cases that respondent relies on pertain to items that would normally be included in income upon receipt even though it may be determined at a future date that they are not to be retained.  E.g., Healy v. Commissioner, 345 U.S. 278 (1953) (salary); United States v. Lewis, 340 U.S. 590 (1951) (bonus from employer); Hirsch Improvement Co. v. Commissioner, 143 F.2d 912 (2d Cir. 1944) (advance payments of rent); Nordberg v. Commissioner, 79 T.C. 655 (1982) (corporate distribution), affd. without published opinion 720 F.2d 658 (1st Cir. 1983); Hope v. Commissioner, 55 T.C. 1020 (1971) (sale of stock), affd. 471 F.2d 738 (3d Cir. 1973); Angelus Funeral Home v. Commissioner, 47 T.C. 391 (1967) (prepaid services), affd. 407 F.2d 210 (9th Cir. 1969); Goldberg v. Commissioner, T.C. Memo. 1997-74 (advance payment for sale of goods); Alexander Shokai, Inc. v. Commissioner, T.C. Memo. 1992-41 (commissions), affd. 34 F.3d 1480 (9th Cir. 1994); Rosenberg v. Commissioner, T.C. Memo. 1956-68 (legal fees).

Accordingly, we hold that the claim of right doctrine does not apply to the case at hand.  Therefore, the deposits that

petitioners received are not included in income in the year received, but in the year the right to retain them is fixed. Since the determination of petitioners' rights to the deposits did not occur in 1989, 1990, or 1991, the years before this Court, the amounts are not included in petitioners' gross income for those years.

Because of our holding above, there is no need to consider petitioners' alternative argument.

An appropriate order

will be issued.