**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

RANDOLPH GEORGE,
*Defendant-Appellant.*

No. 04-10307

D.C. No.
CR-01-00326-MMC

OPINION

Appeal from the United States District Court
for the Northern District of California
Maxine M. Chesney, District Judge, Presiding

Argued and Submitted
April 12, 2005—San Francisco, California

Filed August 23, 2005

Before: Donald P. Lay,* Betty B. Fletcher, and
Michael Daly Hawkins, Circuit Judges.

Opinion by Judge Lay

---

*The Honorable Donald P. Lay, Senior United States Circuit Judge for
the Eighth Circuit, sitting by designation.

---

## COUNSEL

Marcus S. Topel and Daniel F. Cook, Topel & Goodman, San Francisco, California, for the defendant-appellant.

David L. Denier, Assistant United States Attorney, Tax Division, San Francisco, California, for the plaintiff-appellee.

---

## OPINION

LAY, Circuit Judge:

Randolph George was convicted by a jury on two felony counts of willful filing of false tax returns in violation of 26 U.S.C. § 7206(1), and one misdemeanor count of willful failure to file a tax return in violation of 26 U.S.C. § 7203. The district court sentenced George to fifteen months of imprisonment for the false returns, twelve months for failure to file (to run concurrently), and one year of supervised release. Additionally, the district court ordered George to pay $70,000 in restitution, a $20,000 fine, and $125 in special assessments. We affirm.

### I. Background

This case presents two key issues: First, are receivership[1]

---

[1]"A receiver is a court officer or representative appointed to take over the control and management of property that is the subject of litigation

fees paid to a cash-basis taxpayer taxable in the year received even though they are subject to subsequent court review and possible disgorgement? Assuming they are, was the law on this point sufficiently clear to allow a criminal prosecution of George for failure to report this income? We answer both questions in the affirmative.

During 1991, 1992, and 1993, George was affiliated with Media Venture Partnership, which brokered the sale of radio stations and, through its affiliate Media Venture Management, Inc., handled court-appointed receiverships for financially troubled radio stations being sold off to satisfy debts owed to the stations' creditors. Because corporations cannot serve as court-appointed receivers, George, a cash-basis taxpayer, was appointed in his individual capacity to serve as the receiver. George's receiver fees, which were negotiated with the interested parties and approved by the court at the start of the receivership, were paid on an interim basis during the administration of the receivership, usually monthly.

With respect to the present case, George served as the court-appointed receiver for five different stations: Reno Broadcasting (Reno) from October of 1990 to January of 1992, Royal Broadcasting (Royal) from May of 1991 until 1994, KXGO Radio Station from March of 1991 to December of 1992, Diamond Broadcasting (Diamond) from May 1993 to May of 1994, and JJN Broadcasting (JJN) in 1994. In addition to brokerage commissions and income from other sources, George was paid $90,001.42 in receiver fees in 1991, $125,432.66 in 1992, and $154,595 in 1993.[2] Tax returns for

---

before the court, to preserve the property, and ultimately to dispose of it according to the final judgment." 6 WITKIN CAL. PROC. PROVISIONAL REMEDIES § 416 (4th ed. 2004).

[2]The record indicates the disallowed $30,000 of expenses is fully reflected in the $154,595 of receiver fees paid in 1993. Final accountings for the Royal and Diamond receiverships required George to repay a total of $30,000 for disallowed expenses when these receiverships were closed by the court in 1994.

the 1991 and 1992 income were not filed until 1995. George never filed a return reporting the receivership income from 1993.

Nevertheless, when George refinanced the mortgage on his residence in March of 1994, he submitted copies of apparent tax returns for 1991 and 1992, listing the receiver fees as personal income for those years. George also submitted a Statement of Income and Expenses for 1993, listing receiver fees as his personal income. These returns turned out to be fraudulent documents fabricated by George for purposes of obtaining the refinancing of his mortgage.

On January 13, 1995, the Internal Revenue Service (IRS) sent George a written inquiry regarding his 1991 and 1992 returns which had not been filed. George falsely responded that the returns had been filed in December of 1994. George also falsely responded to a subsequent IRS inquiry, asserting that the accounting firm of Antonini Professional Corporation was to have completed the returns, but that it went out of business and another firm was working on the returns. George later prepared the 1991 and 1992 returns himself, filing them on October 16, 1995. Neither George's returns nor his spouse's for 1991 and 1992 reported the receivership fees received during those years. No return was filed by George or his wife for tax year 1993. Finally, The Georges' 1994 joint tax return reported only $23,000 in receiver fees, in addition to income from other sources. These returns, though filed years after George was paid the receiver fees and approximately one year after the last receivership was approved by the court, failed to report $347,029.08 in receiver fees.

When an IRS revenue agent initially interviewed George regarding his 1991 and 1992 returns on July 16, 1996, George did not disclose his employment as a receiver and did not disclose the $90,001.42 of receiver fees from 1991 nor the $125,432.66 of receiver fees from 1992. During a second interview on February 28, 1997, George admitted he earned

the receiver fees, but only after he was confronted with the fraudulent tax returns submitted to the lender in 1994 in support of his mortgage application. A referral for criminal prosecution soon followed.

## II. Analysis

### A. Clarity of the Law

George first argues that, as a matter of law, he lacked wilfulness to commit a crime because the law governing allocation of receiver fees was not clearly established at the time of the offense. The district court's determination that the predicate law was clearly established is a question of law which we review de novo. *See United States v. Schulman*, 817 F.2d 1355, 1358 (9th Cir. 1987) (citing *United States v. Russell*, 804 F.2d 571, 574 (9th Cir. 1986)).

**[1]** The element of wilfulness cannot obtain in a criminal tax evasion case unless "the law clearly prohibited the conduct alleged in the indictment." *Schulman*, 817 F.2d at 1359; *see also James v. United States*, 366 U.S. 213, 221-22 (1961) (vacating taxpayer's conviction for failure to report embezzled funds as income because conflicting caselaw rendered the predicate tax statute ambiguous when applied to embezzled funds). Without sufficient clarity in the law, taxpayers lack the "fair notice" demanded by due process so that they may conform their conduct to the law. *United States v. Dahlstrom*, 713 F.2d 1423, 1427 (9th Cir. 1983) (citing *United States v. Batchelder*, 442 U.S. 114, 123 (1979)). However, a lack of prior appellate rulings on the topic does not render the law vague, nor does a lack of previously litigated fact patterns deprive taxpayers of fair notice. *See Russell*, 804 F.2d at 575 (citing *United States v. Ingredient Tech. Corp.*, 698 F.2d 88, 96 (2d Cir. 1983) (stating that it was "immaterial" that there was no prior litigation directly on point)). Thus, criminal prosecution is permissible when it is "clear beyond any doubt

that [the conduct] is illegal under established principles of tax law . . . ." *Russell*, 804 F.2d at 575.

**[2]** The general income allocation rule provides that "[t]he amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period." 26 U.S.C. § 451(a). The applicable regulations further clarify this general rule by identifying the respective duties for cash-basis and accrual basis taxpayers. "Under the cash receipts and disbursements method of accounting, such an amount is includible in gross income when actually or constructively received." 26 C.F.R. § 1.451-1 (a).[3] Thus, as a cash-basis taxpayer, George would ordinarily be required to report income in the year it is received.[4]

According to George, the statute and regulations are ambiguous as to when receiver fees should be reported as gross income. George points to caselaw that purports to support his claim that receiver fees paid to a cash-basis taxpayer are not taxable until the time of final accounting and approval by the supervising court. According to George, the potential for subsequent disgorgement means that receiver fees are not received under a claim of right. *See e.g., C.I.R. v. Indianapolis Power & Light Co.*, 493 U.S. 203, 209-10 (1990); *American Valmar Int'l Ltd., Inc. v. C.I.R.*, 229 F.3d 98, 102 (2d Cir. 2000); *Ahadpour v. C.I.R.*, 77 T.C.M. (CCH) 1210 (1999), 1999 Tax Ct. Memo LEXIS 9 at * 16-17; *Massey v. C.I.R.*, 143 F.2d 429, 430-31 (5th Cir. 1944); *Parkford v. C.I.R.*, 133

---

[3]We no not reproduce other provisions of 26 C.F.R. § 1.451-1 dealing with allocations under the accrual method of accounting as they do not apply to cash-basis taxpayers like George. Likewise, we do not consider 26 C.F.R. § 1.45-2 applicable as this regulation is specific to the allocation of *constructively-received* income. The record shows that George *actually received* the fees.

[4]George has never claimed to be an accrual basis taxpayer.

F.2d 249, 250 (9th Cir. 1943); *Helvering v. McGlue's Estate*, 119 F.2d 167, 169 (4th Cir. 1941); *C.I.R. v. Cadwalader*, 88 F.2d 274, 274-75 (3d Cir. 1937).

George's reliance on these cases for such a proposition is misplaced. These cases simply suggest that receiver fees paid to cash-basis taxpayers are income in the year actually paid, and fees paid to accrual basis taxpayers are taxable in the year the applicable state law creates a right to demand the fees. *Compare Cadwalader*, 88 F.2d at 275 ("As 1930 was the year in which she in fact received the cash commission from the Roebling estate, that is the year in which the income was received and the tax upon its receipt due.") (cash-basis taxpayer), *and Massey*, 143 F.2d at 430-31 (holding attorney's receipt of cash payment for part of contingency fee taxable in the year actually received; remainder of fee not constructively received or taxable until settlement approved by the court) (cash-basis taxpayer), *with McGlue's Estate*, 119 F.2d at 169 (stating that an *accrual method* taxpayer ordinarily reports executor fees only when entitlement to them attaches under applicable state law, but death of the taxpayer triggers special provision of tax code allocating income as of the date of death despite lack of entitlement under state law), *and Parkford*, 133 F.2d at 250 (holding an *accrual basis* taxpayer *who was not a receiver* need not report commission income for sale of a company which happened to be in receivership until the supervising court approved the sale).

Other cases cited by George provide that funds received while still subject to an express obligation to repay are not income. Unfortunately, these cases have little to do with the type of income at issue here: receiver fees. *See e.g., Indianapolis Power & Light*, 493 U.S. at 214 (stating deposits held by utility to secure payment from customers with poor credit was not income because the utility assumed an express obligation either to apply the deposits to customers' bills or to refund the balance); *American Valmar,* 229 F.3d at 102-03 (finding customer deposits held by international broker not income

because the broker had an obligation to use the deposits for the customers' benefit or to repay them); *Ahadpour*, 1999 Tax Ct. Memo LEXIS 9 at *16-17 (holding earnest money advanced to sellers from escrow under the terms of a contract to sell real property was not income to the sellers in the year received because the contract created an express obligation to repay the funds if the sale did not close).

**[3]** In contrast, two other cases specifically apply the claim of right doctrine to allocate executors' fees in the year they are received. In *United States v. Merrill*, 211 F.2d 297, 299 (9th Cir. 1954), a husband who was appointed as the executor of his wife's estate erroneously paid all of his executor fees out of his wife's segregated share of the community funds. We held that the entire $10,000 of executors' fees paid in 1939 were taxable to him under the claim of right doctrine despite the fact that $2,500 was repaid to the estate in a subsequent year due to the error. *Id.* at 303. *Merrill* therefore unambiguously applied the claim of right doctrine to the receipt of trustee fees even though they were subject to final court approval and were partially repaid.

**[4]** Similarly, the Second Circuit applied the claim of right doctrine to executors' commissions in *Jacobs v. Hoey*, 136 F.2d 954, 956-57 (2d Cir. 1943). The court held that such commissions were taxable in the year received, not in the year the supervising court conferred final approval. Of particular importance to the *Jacobs* court was the fact that the executor negotiated an arrangement with the beneficiaries that allowed advances against his ultimate commission. Because the interested parties had agreed in advance, "there was no reasonable likelihood that the [executor] would be called upon to return the sums that had been paid as commissions." *Id.* at 957. Rejecting the taxpayer's argument that the advance commissions should be treated as loans because they were subject to subsequent court approval and possible disgorgement, the Second Circuit held that the commissions were properly allo-

cated to the taxpayer under the claim of right doctrine in the years they were actually paid. *Id.* at 956.

**[5]** We conclude that the law clearly required George, a cash basis taxpayer, to report the receiver fees in the years he received them. We find 26 U.S.C. § 451 and the applicable cash-basis provision of 26 C.F.R. § 1.451-1 free from ambiguities regarding allocation of George's income. As stated in the regulation, "[u]nder the cash receipts and disbursements method of accounting, such an amount is includible in gross income when actually or constructively received." 26 C.F.R. § 1.451-1 (a).

**[6]** The fact that George's receiver fees were subject to possible disgorgement at the time of a subsequent final accounting does not remove them from the claim of right doctrine. To the contrary, George's fees were taxable in the year received "even though it may [have been] claimed that he [was] not entitled to retain the money, and even though he may [have been] adjudged liable to restore its equivalent." *N. Am. Oil Consolidated v. Burnet*, 286 U.S. 417, 424 (1932). *Merrill* and *Jacobs* confirm that executor fees and commissions are not exempt from the claim of right doctrine merely because they are subject to final court approval and possible disgorgement.**⁵** Likewise, the fact that some fees were actually repaid does not insulate the fees from the claim of right doctrine. *See Merrill,* 211 F.2d at 303*; see also Rasmus v. C.I.R.*, 47 T.C.M. (CCH) 829 (1984), 1984 Tax Ct. Memo LEXIS 664 at *14 (holding funds misappropriated from estate by the administering attorney constituted income to the attorney in

---

**⁵**If anything, the fact that the courts supervising the receiverships approved George's fees demonstrates that he, like the executor in *Jacobs*, faced little threat of disgorgement. *See People v. Riverside Univ.*, 35 Cal. App. 3d 572, 587 (1973) ("It is settled that fees awarded to receivers are in the sound discretion of the trial court and in the absence of a clear showing of an abuse of discretion, a reviewing court is not justified in setting aside an order fixing fees.").

the year misappropriated despite subsequent repayment). These same principles apply to receiver fees like George's.

**[7]** Short of an express obligation to repay*,* a contingent obligation to repay a portion of receiver fees actually paid to a cash-basis taxpayer does not remove these payments from the claim of right doctrine. *See Merrill*, 211 F.2d at 303-04. This is because "a potential or dormant restriction . . . which depends on the future application of rules of law to present facts, is not a 'restriction on use' within the meaning of [the claim of right doctrine]." *Healy v. C.I.R.*, 345 U.S. 278, 284 (1953). Indeed, application of the claim of right doctrine does not turn on the relative likelihood of a contingent obligation coming to fruition nor does it depend on the legitimacy of the taxpayer's right to retain the funds. *See James*, 366 U.S. at 219-20 (stating illegally obtained funds are considered income and subject to the claim of right doctrine). Instead, the relevant inquiry centers on the taxpayer's dominion and control of the funds, *see Indianapolis Power & Light*, 493 U.S. at 212, and the manner in which the taxpayer treats the funds, *see Alexander Shokai, Inc. v. C.I.R.*, 34 F.3d 1480, 1485 (9th Cir. 1994). "A taxpayer receives a payment under a claim of right when he treats the payment 'as belonging to him.' " *Id.* (quoting *Healy*, 345 U.S. at 282).[6]

**[8]** In sum, the district court correctly determined that the claim of right doctrine applied to George's receiver fees. The law on this point was sufficiently clear to allow prosecution for failure to report such fees in the years received.

## B. Good Faith Defense

George next argues that because he held a good faith belief

---

[6]Taxpayers who are eventually called upon in a subsequent year to repay funds acquired under a claim of right are entitled to an offsetting deduction in the year of repayment. *See Alexander Shokai,* 34 F.3d at 1485; *see also* 26 U.S.C. § 1341(a).

the receiver fees were not taxable until the year in which the final accountings were approved and the receiverships were closed by the supervising courts, the evidence was insufficient to support his conviction. When preserved in the district court through a motion for acquittal as it was in this case, we review a challenge to the sufficiency of the evidence de novo. *See United States v. Carranza*, 289 F.3d 634, 641 (9th Cir. 2002) (citing *United States v. Munoz*, 233 F.3d 1117, 1129 (9th Cir. 2000)). In this review, we examine the evidence in the light most favorable to the government and determine whether "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)).

**[9]** Willfulness is an element of making and filing a false tax return. *See* 26 U.S.C. § 7206(1). To establish the requisite level of willfulness, the government must prove "that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991). The government cannot carry this burden without negating the defendant's claim that he was ignorant of the law, that he misunderstood the law, or that he held a good-faith belief his conduct did not violate the law. *Id.* at 202. Good faith reliance on a qualified tax accountant is a defense to willfulness. *See United States v. Bishop*, 291 F.3d 1100, 1106-07 (9th Cir. 2002).

**[10]** Viewing the evidence in the light most favorable to the government, we conclude the government met its burden to prove willfulness, including its burden to negate George's good faith defense. The government presented overwhelming evidence at trial which proved that the vast majority of the receiver fees paid to George were *never* reported on *any* tax return. The government's evidence showed that two of the receiverships (Reno and Diamond) were closed in 1992, yet

George did not report the receiver fees from these receiverships on his 1992 returns. This is fundamentally inconsistent with George's good faith defense that he was waiting until the receiverships were closed to report the income. Furthermore, the government's evidence showed that in 1994, the year the other receiverships closed, George failed to report the vast majority of the other receiver fees paid to him in 1991 and 1992. Based on this, a rational trier of fact could have concluded that there was no good faith on George's part.

**[11]** Additionally, prosecution witness Orlando Antonini testified his firm was never retained by George to prepare his individual income tax returns. This testimony undermined George's claim that he relied on personal advice from Antonini in deciding not to report the fees until the receiverships were closed. Notably, defense counsel never asked Antonini whether he personally advised George to report the receiver fees on his personal returns in the year that the court approved the final accounting of the receivership, as opposed to the year the fees were actually received. George was the sole witness who testified to that effect, and the jury apparently found his testimony to be less than credible. Thus, we reject George's good faith defense.

## C. Jury Instructions

**[12]** George claims that the district court committed reversible error when it adopted a claim of right jury instruction and rejected his proposed contingent payment jury instruction. We review the district court's rejection of the defendant's proffered instructions de novo when this decision is based on a question of law. *See United States v. Eshkol*, 108 F.3d 1025, 1028 (9th Cir. 1997) (citing *United States v. Duran*, 59 F.3d 938, 941 (9th Cir. 1995)). Whether the claim of right doctrine applies to receiver fees is a question of law. *See Alexander Shokai*, 34 F.3d at 1485. While a defendant is entitled to an instruction that adequately addresses his theory of defense, he is not entitled to an instruction that misstates the law. *See*

*United States v. Hicks*, 217 F.3d 1038, 1045 (9th Cir. 2000) (rejecting defendant's proffered instructions because, among other things, they "were not legally accurate").

The district court gave the following instruction:

> Defendant is a cash-basis taxpayer. For a cash-basis taxpayer, income must be included as gross income on his federal income tax returns for the taxable year in which the income is actually received by the taxpayer. Income is actually received by a taxpayer when it is actually reduced to his possession. If a cash-basis taxpayer is paid income by check, the check constitutes income to the cash-basis taxpayer when he receives it. Income deposited in the taxpayer's bank is actually reduced to the taxpayer's possession.

George's proffered instruction would have added that income is not reduced to the taxpayer's possession "if the receipt is . . . subject to substantial limitations or restrictions." George's proffered instruction went on to state:

> [o]ne substantial limitation or restriction includes the receipt of the income by a trustee or receiver subject to later court approval of the amount received. In such circumstances, the income is not considered received until the court provides its final approval and is considered received and is to be reported in the tax year in which the court approval is obtained even though monies were actually received and used by the trustee or receiver at an earlier time.

**[13]** We conclude the district court committed no error in rejecting George's proffered jury instruction. George's instruction misstated a cash-basis taxpayer's duty to report income in the year received, *see* 26 C.F.R. § 1.451-1 (a), and ignored the long-settled principle that income is taxable in the

year received "even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." *N. Am. Oil,* 286 U.S. at 424.

## D. Motion for New Trial

George seeks a new trial based on the receivership returns for Royal and Diamond which he alleges were newly discovered after trial. George claims these receivership returns, which are entirely separate from his personal tax returns, show that prosecution witness Orlando Antonini presented material testimony that was incorrect, misleading, and false.

This court reviews a denial of a motion for new trial based upon newly discovered evidence for an abuse of discretion. *See United States v. Kulczyk*, 931 F.2d 542, 548 (9th Cir. 1991) (citing *United States v. Lopez*, 803 F.2d 969, 977 (9th Cir. 1986)). To prevail on a motion for new trial based upon newly discovered evidence, the defendant must show (1) the evidence is newly discovered; (2) failure to discover the evidence sooner was not due to lack of diligence; (3) the evidence was material to trial issues; (4) the evidence was not cumulative or merely impeaching; and (5) a new trial, if granted, would probably result in acquittal. *See id.*; *see also* FED. R. CRIM. P. 33.

**[14]** We are not persuaded that the district court abused its discretion in denying George's motion for a new trial. George's failures to subpoena Antonini before trial or contact the California State Franchise Tax Board to obtain copies of the radio stations' state returns suggest that George was not diligent.

Moreover, the newly discovered evidence was not material. At trial, the prosecution called Antonini to testify for the purpose of showing that George never retained Antonini to prepare George's 1991 and 1992 personal tax returns,

contradicting George's testimony that he relied on Antonini's advice to delay reporting receivership fees until the receiverships were closed. Antonini did testify that his firm performed bookkeeping work for George's receiverships and may have prepared tax returns for them, but when defense counsel presented Antonini with *unsigned* copies of the Royal Broadcasting returns, Antonini refused to state that his firm prepared them because the copies lacked any indicia of identification. We acknowledge that, had the newly acquired receivership returns been presented to Antonini at trial, Antonini would have been forced to admit that his firm prepared them. Still, this concession would not have bolstered George's claim that Antonini advised George not to declare receiver fees on his personal tax returns. It would have only established a collateral point — who prepared the receiverships' returns.

**[15]** Next, assuming *arguendo* that the new returns partially impeached Antonini's credibility, this would not merit a new trial. *See Kulcyk*, 931 F.2d at 549 (stating "evidence that would merely impeach a witness cannot support a motion for a new trial"). Given the lack of materiality and George's apparent credibility problem, it is unlikely the new evidence would have resulted in an acquittal for George. Thus, we affirm the district court's denial of George's motion for a new trial.

### E. Sentencing

George contends the district court erred when it included tax losses for fiscal year 1994, and tax losses attributable to George's spouse from 1991-1993, as relevant conduct for the purposes of determining George's total tax losses under the United States Sentencing Guidelines (U.S.S.G.). He cites *United States v. Booker*, 125 S. Ct. 738 (2005), to support his position.

A probation officer prepared a presentence investigation report (PSR) which included tax losses from fiscal year 1994,

and tax losses attributable to George's spouse from 1991-1993, in calculating total tax losses of $145,685 incurred as a result of George's illegal conduct. This amount of tax loss corresponded to an offense level of 15. The district court considered but ultimately disregarded the recommendation contained in the PSR. Instead, the district court simply accepted the total tax loss amount stipulated to by the parties i.e., tax losses of "more than $70,000 but less than $120,000, resulting in a base offense level of 14 pursuant to U.S.S.G. § 2T4.1 (1994)." George's sentence was therefore not based upon any judicial factfinding; his sentence was based on tax losses to which George admitted in the stipulation, and no Sixth Amendment issue exists.

[16] The absence of a Sixth Amendment violation, however, is not the end of our inquiry. *See United States v. Stafford*, 2005 WL 1813313 at *7 (9th Cir. 2005) ("While it appears that the facts upon which the obstruction of justice enhancement was based were admitted by the defendant, we nonetheless follow *Ameline's* 'limited remand' approach."). "[D]efendants are entitled to limited remands in *all* pending direct criminal appeals involving unpreserved *Booker* error, whether constitutional or nonconstitutional." *United States v. Moreno-Herdandez*, No. 03-30387, 2005 WL ___, at *___ (9th Cir. August 17, 2005).

[17] On the record before us, we cannot determine whether the district court would have imposed a materially different sentence under a discretionary sentencing regime. Accordingly, we remand George's sentence in accordance with *United States v. Ameline*, 409 F.3d 1073, 1084-85 (9th Cir. 2005) (en banc).

### III. Conclusion

George's conviction is affirmed, but this case is remanded to the district court to review the sentence in accordance with *Ameline*.

**AFFIRMED in part and REMANDED in part.**