# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

SOLOMON BITTON SIMTOB,
    *Defendant-Appellant.*

No. 06-30120

D.C. No.
CR-96-00025-SEH

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

SOLOMON BITTON SIMTOB, aka
Simon Simtob,
    *Defendant-Appellant.*

No. 06-30275

D.C. No.
CR-05-00130-SEH

OPINION

Appeals from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted
February 8, 2007—Seattle, Washington

Filed May 11, 2007

Before: Raymond C. Fisher and Richard C. Tallman,
Circuit Judges, and David Alan Ezra,* District Judge.

Opinion by Judge Ezra

*The Honorable David Alan Ezra, United States District Judge for the
District of Hawaii, sitting by designation.

5563

**COUNSEL**

Anthony R. Gallagher, Federal Defender, David F. Ness (argued), Assistant Federal Defender, Great Falls, Montana, for the appellant.

William M. Mercer, United States Attorney, Carl E. Rostad (argued), Assistant United States Attorney, Great Falls, Montana, for the appellee.

**OPINION**

EZRA, District Judge:

Appellant Solomon Bitton Simtob raises three issues in this consolidated appeal from the district court's sentence follow-

ing revocation of his supervised release and from his conviction and sentence. We first address whether, in light of *United States v. Miqbel*, 444 F.3d 1173 (9th Cir. 2006), the sentence imposed following revocation of Simtob's supervised release was reasonable. We next address whether the district court abused its discretion when it failed to conduct an inquiry of a juror concerning a complaint that Simtob was "eye-balling" the juror and that the juror felt "threatened." Finally, Simtob challenges the reasonableness of the sentence imposed for his conviction.

Because the district court rendered the decision to revoke Simtob's supervised release without the benefit of *Miqbel*, we vacate the revocation sentence and remand for reconsideration in light of our directives set forth in *Miqbel* and clarified herein. We also vacate Simtob's conviction and remand for the district court to determine whether Simtob's alleged misconduct toward the juror resulted in a biased jury. Because we vacate Simtob's conviction, we also vacate Simtob's sentence for that conviction, rendering Simtob's challenge to the reasonableness of his sentence moot.

## Factual and Procedural History

On June 21, 1996, Simtob was indicted on various federal drug charges ("1996 indictment"). Following a jury trial held in April 1997, Simtob was convicted of the following offenses: Count I, Conspiracy to Distribute Cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846; Count II, Possession of Cocaine with Intent to Distribute in violation of 21 U.S.C. § 841(a)(1); and Count IV, Possession of Cocaine with Intent to Distribute in violation of 21 U.S.C. § 841(a)(1). On July 29, 1997, Simtob was sentenced to 41 months imprisonment followed by a six year term of supervised release.

On August 4, 2005, a United States Probation Officer filed a petition to revoke Simtob's supervised release on the 1996 indictment. Almost two months later, on September 26, 2005,

Simtob was indicted again on federal drug charges and on an obstruction of justice charge that flowed from the conduct underlying the petition to revoke ("2005 indictment"). Consequently, the revocation proceedings on the 1996 indictment were stayed pending the outcome of the prosecution on the 2005 indictment.

On December 27 and 28, 2005, a jury trial was held on the 2005 indictment. At the end of the first day, in open court and outside of the presence of the jury, the district court informed counsel that a juror had reported that Simtob had been "eyeballing" the juror and that the juror felt threatened by that conduct. The court then cautioned Simtob that neither he nor anyone else was allowed to intimidate anyone in the courtroom. The court further stated that, upon indication of such conduct in the future, it would take appropriate measures to deal with the situation at that time, and it again emphasized its intolerance of such behavior. When asked if the court's instructions were clear, Simtob responded that they were, and that he had not looked at anyone in particular. "I look at everybody," Simtob claimed. The district court did not make any inquiry of the complaining juror regarding the "eyeballing" incident.

At the start of the second day of trial, Simtob's counsel raised a concern that, because of Simtob's alleged misconduct, a juror may have made up his or her mind about the verdict already. Counsel asked that the juror be replaced with an alternate to avoid any problems associated with the juror's perceptions. The Government responded that, if any action were taken, which it thought unnecessary, the court should inquire of the juror or hold an in-camera hearing to determine whether the juror in fact had prematurely made up his or her mind about Simtob's guilt. The district court ruled that the jury had been "repeatedly admonished not to make up its mind about any issue," that it was "absolutely satisfied that the jury ha[d] taken those admonishments appropriately," and that it saw "no reason to inquire further into th[e] matter . . . ."

In reaching that conclusion, the court emphasized that Simtob "disavowed having engaged in any such conduct." Ultimately, the court decided that the "issue is best left where it is," seeing no need to replace the juror.

Simtob was subsequently convicted on Counts I and II for possession with intent to distribute methamphetamine in violation of 21 U.S.C. § 841(b)(1)(B) and distribution of methamphetamine in violation of 21 U.S.C. § 841(b)(1)(C) ("2005 conviction"). Simtob was acquitted on the obstruction charge.

On February 8, 2006, before Simtob was sentenced for the 2005 conviction, the court held a hearing on the revocation of supervised release concerning the 1996 indictment. The district court found that, contrary to Simtob's arguments, Simtob was on supervised release when he committed the violations leading to the 2005 conviction. Emphasizing that the offense underlying the revocation was the same offense that led to Simtob's 2005 conviction, the court found that Simtob violated the terms of his supervised release, the violation was a Class A violation, and the severity of the conduct required revocation. The court concluded that the evidence, as a whole, demonstrated "a continued pattern of unlawful behavior by [Simtob] that is representative of what [he] [had] done over the years on a repeated basis." The court, moreover, determined that Simtob's "very serious conduct" warranted imposition of the maximum statutory penalty. It also found that the Guidelines range was "inadequate to address the seriousness of the defendant's violation, and all of the circumstances of the current violations." Consequently, the court sentenced Simtob to the statutory maximum of three years in custody with no supervised release.

On April 3, 2006, the court sentenced Simtob for the 2005 conviction, finding the recommended Guidelines range of 78 to 97 months inadequate and sentencing Simtob to 240 months imprisonment on Count I and to 97 months on Count

II, to be served concurrently, followed by eight years of supervised release on Count I and six years on Count II, to be served concurrently.

## Jurisdiction and Standard of Review

We have jurisdiction pursuant to 28 U.S.C. § 1291. We review sentences, including those imposed upon revocation of supervised release, for reasonableness. *See Miqbel*, 444 F.3d at 1176 n.5 (citing *Booker*, 543 U.S. at 261-62). We review a district court's decision not to conduct an inquiry of a juror or to hold an evidentiary hearing concerning a defendant's alleged misconduct toward a juror for an abuse of discretion. *See United States v. Long*, 301 F.3d 1095, 1101 (9th Cir. 2002) (per curiam).

## Discussion

### I. *Reasonableness of the revocation sentence*

Simtob challenges the district court's imposition of his sentence upon revocation of his supervised release. Specifically, Simtob argues that his revocation sentence is unreasonable because the court relied on the seriousness of the offense underlying the revocation when determining his sentence, in contravention of *Miqbel*. The Government responds that, even if that consideration were improper, the court rested its sentencing decision on other permissible factors, such as Simtob's continued pattern of unlawful conduct. Thus, the Government argues that Simtob's sentence should stand.

**[1]** On February 8, 2006, the district court sentenced Simtob to the maximum statutory penalty of three years for violating his supervised release. Since then, we have issued a decision that provides further guidance concerning what district courts may properly consider in revocation sentencing. *See Miqbel,* 444 F.3d 1173. In *Miqbel*, we determined that certain considerations under 18 U.S.C. § 3553(a)(2)(A)

(2003) that are proper for general sentencing purposes — such as the need to "promote respect for the law" and "to reflect the seriousness of the [underlying] offense" — are not proper for the purpose of sentencing upon revocation of supervised release. *Miqbel*, 444 F.3d at 1181-82. That is so because the section of the statute dealing with revocation sentencing considerations, 18 U.S.C. § 3583(e), specifically omits 18 U.S.C. § 3553(a)(2)(A) from consideration. *See id.* Additionally, given the purpose of sentencing upon revocation of supervised release to sanction for a "breach of trust," the considerations under 18 U.S.C. § 3553(a)(2)(A) would be inappropriate and unnecessary to achieve that purpose. *See* United States Sentencing Guidelines Manual ("U.S.S.G.M.") Ch.7, Pt. A(3)(b) (2006). Accordingly, we held that "a court may appropriately sanction a violator for his 'breach of trust,' but may not punish him for the criminal conduct underlying the revocation." *Miqbel*, 444 F.3d at 1182.

**[2]** We take this opportunity to clarify the directives set forth in *Miqbel*. Contrary to Simtob's contention, we did not set forth a blanket proposition that a court in no circumstances may consider the seriousness of the criminal offense underlying the revocation. The seriousness of the offense underlying the revocation, though not a focal point of the inquiry, may be considered to a lesser degree as part of the criminal history of the violator. As the Sentencing Guidelines Manual indicates, "at revocation the court should sanction primarily the defendant's breach of trust, while taking into account, to a limited degree, the *seriousness of the underlying violation* and the *criminal history of the violator*." U.S.S.G.M. Ch.7, Pt. A(3)(b) (emphasis added). Indeed, 18 U.S.C. § 3583(e) specifically directs sentencing courts to consider "the nature and circumstances of the offense and the history and characteristics of the defendant," as set forth in 18 U.S.C. § 3553(a)(1).

To ignore the new violation underlying the revocation entirely would be to ignore a key predictor of a violator's potential for reintroduction into society without relapse. *See*,

*e.g.*, *United States v. Tadeo*, 222 F.3d 623, 626 (9th Cir. 2000) (finding no abuse of discretion where the court found that the use of narcotics in violation of supervised release created a risk that the defendant would commit serious crimes because some of his past criminal activity occurred while under the influence). The history of the violator, when combined with the violator's most recent criminal offenses, and particularly when similar to the past transgressions, is indicative of the violator's propensity for recidivism and inability to integrate peacefully into a community. *See id.*; U.S.S.G.M. Ch.7, Pt. A(4) (2006) (determining "that the purpose of . . . supervised release should focus on the integration of the violator into the community, while providing the supervision designed to limit further criminal conduct"); *see also* 18 U.S.C. §§ 3553(a)(2)(B) (2003) (affording deterrence as one consideration) and 3553(a)(2)(C) (2003) (protecting the public from further crimes as another); 18 U.S.C. § 3583(e) (permitting the preceding factors for consideration in revocation sentences). A history of, for example, drug-related offenses, combined with a drug-related offense underlying the revocation, as is the case here, creates a greater likelihood that the violator will relapse into the same or similar criminal activity. A violator who, after committing an offense and being placed on supervised release for that offense, again commits a similar offense is not only more likely to continue on that path, but also has demonstrated to the court that the violator has little respect for its command. Because the district court's trust in the violator's ability to coexist in society peacefully has been broken to a greater degree than if the violator had committed a minor offense of a dissimilar nature, greater sanctions may be required to deter future criminal activity. Consequently, if the nature and the severity of the underlying offense were removed from the equation altogether, the court's ability to predict the violator's potential for recidivism and to punish the violator for the violator's full breach of trust (and, ultimately, to deter the violator and to protect the public) would be impaired significantly.

[3] A district court may not impose a revocation sentence *solely*, or even primarily, based on the severity of the new

criminal offense underlying the revocation, as the sentence for that offense is left to the sentencing court. *See Miqbel*, 444 F.3d at 1182; *see also* U.S.S.G.M. Ch.7, Pt. A(3)(b) (viewing "the court with jurisdiction over the criminal conduct leading to revocation [a]s the more appropriate body to impose punishment for that new criminal conduct"). Any new sentence imposed for the underlying offense will be consecutive to any sanctions imposed for violating the court's trust. *See* U.S.S.G. § 7B1.3(f) (2004) ("Any term of imprisonment imposed upon the revocation of . . . supervised release *shall* be ordered to be served *consecutively* to any sentence of imprisonment that the defendant is serving, whether or not the sentence of imprisonment being served resulted from the conduct that is the basis of the revocation of . . . supervised release." (emphasis added)). The idea behind that punishment scheme is that the violator should be punished both for breaching the court's trust *and* for the new criminal conduct, as each act is separately and distinctly offensive. *See* U.S.S.G.M. Ch.7, Pt. A(3)(b) (commenting that, consistent with the "breach of trust" theory that the Commission adopted as the approach to revocation sentencing, "the sanction for the violation of trust should be in addition, or consecutive, to any sentence imposed for the new conduct"). Notwithstanding this scheme, a district court may properly look to and consider the conduct underlying the revocation as one of many acts contributing to the severity of the violator's breach of trust so as not to preclude a full review of the violator's history and the violator's likelihood of repeating that history. *See United States v. Brown*, 203 F.3d 557, 558 (8th Cir. 2000) (per curiam) (considering, at a revocation hearing, the seriousness of the defendant's criminal history and the frequency of the defendant's violations of supervised release). This is fully consistent with the Supreme Court's mandate in *Booker* that sentencing courts look to a defendant's full background when sentencing the defendant. *See* 543 U.S. at 251-54.

**[4]** Here, the weight that the district court gave the seriousness of Simtob's criminal conduct underlying the revocation

of supervised release is unclear. The district court cited Simtob's "continued pattern of unlawful behavior," a permissible consideration under § 3583(e), but it also stated that the offense leading to the revocation of supervised release was "very serious conduct" and it found the "Chapter 7 policy statements and [G]uideline[s] range . . . inadequate to address the seriousness of [Simtob's] violation, and all of the circumstances of the current violations." To the extent that the district court placed special emphasis on the seriousness of Simtob's new criminal conduct as the primary consideration for the sentence upon revocation of supervised release, the court's sentence would be unreasonable. Because the district court rendered its decision without the benefit of *Miqbel*, we vacate and remand for re-sentencing in light of the permissible considerations set forth in *Miqbel* and clarified herein.

## II.  *Possible juror bias*

Simtob contends that because the juror indicated that his alleged act of "eye-balling" the juror made the juror feel "threatened," the juror's perception of the event may have influenced the verdict on his underlying drug convictions. Simtob further argues that the court failed to take appropriate corrective measures to rectify the perceived problem. Thus, Simtob requests that we remand for an evidentiary hearing on this issue. The Government responds that an evidentiary hearing was unnecessary because Simtob denied having engaged in any such conduct and the court acted appropriately given the relatively neutral nature of the conduct. The Government further argues that, even if the court should have pursued the matter further, any error was harmless, given the "overwhelming evidence" on the drug counts and the acquittal on the obstruction count.

**[5]** We review "a trial court's decision regarding jury incidents . . . for [an] abuse of discretion." *Long*, 301 F.3d at 1101. A defendant has a Sixth Amendment right to "a verdict by impartial, indifferent jurors" to avoid any bias or prejudice

that might affect the defendant's right to a fair trial. *Dyer v. Calderon*, 151 F.3d 970, 973 (9th Cir. 1998) (en banc); *see also United States v. Soulard*, 730 F.2d 1292, 1305 (9th Cir. 1984). Improper influence or bias of a single juror would affect that right. *See United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000). When there has been improper contact with a juror or any form of jury tampering — whether direct or indirect — we apply a presumption of prejudice. *United States v. Rutherford*, 371 F.3d 634, 641 (9th Cir. 2004); *see also Remmer v. United States*, 347 U.S. 227, 229 (1954). The burden rests on the Government to rebut this presumption and to demonstrate that any alleged jury improprieties were harmless beyond a reasonable doubt. *See Rutherford*, 371 F.3d at 641; *Remmer*, 347 U.S. at 229.

[6] Despite the lack of evidence that Simtob had any direct contact with the jury, the presumption of prejudice applies here because "even indirect coercive contacts that could affect the peace of mind of the jurors give rise to the Remmer presumption." *Rutherford*, 371 F.3d at 642 n.6 (citing *United States v. Angulo*, 4 F.3d 843 (9th Cir. 1993)). That at least one juror's "peace of mind" was affected is obvious from the district court's assertion that the juror claimed that he or she felt threatened by Simtob. The Government, therefore, bears the burden of rebutting the presumption of prejudice.

This the Government cannot do on the record before us. When a source presents the court with a "colorable claim of juror bias," the court must make some inquiry of the juror, whether through an in camera hearing or otherwise, to determine whether the allegedly affected juror is incapable of performing the juror's functions impartially. *See Dyer*, 151 F.3d at 974-75. A court has "considerable discretion" in determining how to handle such a claim and "in defining its nature and extent," *United States v. Soulard*, 730 F.2d at 1292, 1305 (9th Cir. 1984), so long as the investigation does not extend beyond permissible limits of inquiry. *See United States v. Elias*, 269 F.3d 1003, 1020 (9th Cir. 2001).

**[7]** From the record, we cannot discern whether Simtob's alleged conduct of "eye-balling" impaired the juror's ability to act impartially. The district court conducted no inquiry of the juror from which it could draw any inferences of the juror's impartiality, even though the juror claimed, during trial, that "he or she *felt* that [Simtob] was staring at [him or her] in a threatening manner." (Emphasis added.) Nor did the district court consider the possibility that the juror may have communicated his or her perception of a threat to other jurors. *Cf. Angulo*, 4 F.3d at 847 (remanding because the district court excused a juror who felt threatened due to an anonymous phone call but "never explained [the excused juror's] absence to the other jurors, who knew she had received the threatening telephone call" or "question[ed] the other jurors about what effect the threat to [the excused juror] and her subsequent dismissal from venire had on them"). The district court did not issue any curative instructions to the jury regarding the perceived threat, nor did it address the jury about the incident in any way. *Cf. United States v. Owens*, 426 F.3d 800, 804-05 (6th Cir. 2005) (refusing to remand where, after a complaining juror had "expressed fear," "[u]pon the agreement of both parties, the court instructed the courtroom deputy to advise the jury that . . . [the defendant] does not pose a security risk to anyone"). Thus, we cannot agree with the district court's apparent satisfaction that Simtob's Sixth Amendment rights had not been jeopardized merely because Simtob "disavowed" any such conduct and the court previously had admonished the jury members not to make up their minds about any issue.

Without any inquiry whatsoever into the juror's state of mind or communications with other jurors, the district court had no way of knowing whether any juror harbored lingering bias from the eye-balling incident. Although helpful to aid our understanding of the measures that the court undertook to rectify the perceived problem, the district court's handling of the incident sheds no light on the juror's actual state of mind. The question of bias is still open, and it is one that we cannot

answer on this record because it is a factual determination for the district court to make.

**[8]** Because the district court made no inquiry of the juror when the juror voiced his or her concern that the defendant's alleged act of eye-balling the juror made the juror feel threatened, it abused its discretion in failing to take proper remedial action on the facts of this case. We, therefore, vacate Simtob's conviction and remand for the district court to recall the complaining juror and to undertake whatever inquiry it deems appropriate — whether through an in camera hearing or otherwise — to determine whether the perceived threat impaired that or any other juror's ability to act fairly and impartially.[1] Upon remand, the district court must make findings about possible bias that the affected juror or any other juror may have harbored as a result of the alleged eyeballing incident. If the district court finds no such impairment, it can, of course, reinstate the conviction.

Before concluding, we acknowledge the Government's argument that the fact that Simtob was acquitted on one charge may diminish the possibility that bias was present. That Simtob was acquitted on one charge, however, does not erase the potential that bias might have contributed to the juror's ability (or inability) to act fairly and impartially with respect to the other charges. There are many reasons that could explain away the acquittal, including ones that would work against the Government's argument, seeing as the acquittal could have been caused by the juror's fear of retalia-

---

[1]We recognize the difficulties in recalling a juror post-verdict, such as memory deficiency, locating the juror, and inconvenience to the juror. We also acknowledge the hesitancy that courts face in "haul[ing] jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences." *United States v. Sun Myung Moon*, 718 F.2d 1210, 1234 (2d Cir. 1983). Nonetheless, we find that there is a substantial, non-speculative ground that justifies such an action in the instant case to ensure that Simtob's Sixth Amendment rights have not been violated. *See id.*

tion. Simtob's partial acquittal, therefore, does not change our decision to vacate and remand.

III.   *Reasonableness of sentence for the 2005 conviction*

Simtob challenges the reasonableness of the district court's decision to depart from the Guidelines when sentencing Simtob for the 2005 conviction based on the court's determination that the Guidelines did not adequately take into account the 18 U.S.C. § 3553(a) sentencing factors. Because we vacate Simtob's 2005 conviction, however, we also vacate the sentence imposed for it, mooting Simtob's challenge.

## Conclusion

Because the district court's revocation sentencing decision was made without the benefit of *Miqbel*, we vacate and remand for re-sentencing in light of that decision and the clarifications herein. We likewise vacate Simtob's 2005 conviction and remand for the district court to recall the affected juror and to determine whether the juror was capable of performing his or her duties impartially during trial and to take appropriate action as it finds warranted in light of the juror's response. Because we vacate Simtob's conviction, we also vacate his sentence, mooting his challenge to its reasonableness.

**VACATED and REMANDED**.