**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

LUKE D. BRUGNARA,
*Defendant-Appellant.*

No. 15-10509

D.C. No.
3:14-cr-00306-WHA-1

OPINION

Appeal from the United States District Court
for the Northern District of California
William H. Alsup, District Judge, Presiding

Argued and Submitted January 10, 2017
San Francisco, California

Filed May 11, 2017

Before: J. Clifford Wallace and Milan D. Smith, Jr., Circuit
Judges, and Ralph R. Erickson, District Judge.[*]

Opinion by Judge Wallace

---

[*] The Honorable Ralph R. Erickson, United States District Judge for
the District of North Dakota, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed convictions for wire fraud, mail fraud, false declaration before a court, escape, and contempt, in a case in which the defendant represented himself at trial.

The panel held that the district court did not abuse its discretion in denying the defendant's motion for a new trial based on newly discovered valuation evidence, where the defendant was not diligent in seeking the evidence.

The panel held that there was sufficient evidence to support the convictions for wire fraud, mail fraud, and false declaration.

The panel held that prison officials did not violate the defendant's Sixth Amendment right to access legal materials, where there is no evidence that the defendant was denied any access, let alone reasonable access.

The panel held that the defendant waived his contention that juror I.J.'s failure to truthfully answer a question about criminal history during voir dire deprived him of his right to a fair trial. Assuming without deciding that juror C.D. failed to answer honestly a material voir dire question, the panel held that C.D.'s presence did not violate the defendant's right to an impartial jury because a truthful answer would not have provided a valid basis to challenge C.D. for cause.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel rejected the defendant's arguments concerning his ability to represent himself. The panel held that under *Faretta v. California*, a trial court is permitted, but not required, to terminate an incorrigible pro se defendant's self-representation. The panel concluded that the district court's decision to allow the defendant to represent himself ultimately to his own detriment did not violate his right to a fair trial. The panel did not need to reach whether *Indiana v. Edwards* imposes a duty to terminate self-representation because the defendant has not shown that he suffers from severe mental illness to the point that he is not competent to conduct trial proceedings by himself.

The panel held that the district court was not obligated to hold a competency hearing sua sponte at sentencing, where the defendant was capable of assisting in his own defense at sentencing, and did so. The panel held that the district court did not err in failing to hold a competency hearing sua sponte during trial, where a reasonable judge would not have found it necessary to doubt the defendant's competency.

## COUNSEL

Dena M. Young (argued), Law Offices of Dena Marie Young, Santa Rosa, California, for Defendant-Appellant.

Meredith B. Osborn (argued), Assistant United States Attorney; Barbara J. Valliere, Chief, Appellate Division; Brian J. Stretch, United States Attorney; United States Attorney's Office, San Francisco, California; for Plaintiff-Appellee.

**OPINION**

WALLACE, Senior Circuit Judge:

Luke Brugnara appeals from his convictions following a jury trial for two counts of wire fraud and one count each of mail fraud, false declaration before a court, escape, and contempt. He also appeals from a plethora of summary contempt citations stemming from his conduct during trial. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

I.

The events of this case trace back to March 2014, when Luke Brugnara, a former San Francisco real estate tycoon with a fondness for high-end art, agreed to purchase several million dollars' worth of paintings and other works from art dealer Rose Long for display in his museum. There were two problems: Brugnara had neither the means to pay for the works nor a museum in which to place them. He did not share this information with Long. The promise to put the art in a museum secured him a ten percent discount on the cost. Even at the reduced price, he refused to pay a deposit or any of the shipping costs, which Long considered unusual.

Long traveled to San Francisco that April to be present when the art was delivered to what she believed was Brugnara's museum. Upon arriving at the address Brugnara had given her, she discovered that it was his personal residence. Long had serious misgivings about leaving five crates of art in a garage, but nonetheless allowed the crates to be unloaded. Brugnara had previously expressed a desire to inspect the art, but rebuffed Long's attempt to do so at the

time of delivery because, according to him, he had an appointment to view some property that morning. As a result, none of the crates had been opened when Long left Brugnara's home.

The negotiations began to run into difficulty when Brugnara continued to dissuade Long in her attempts to inspect the art with him, always claiming that he was too busy. Long and her partner, Walter Maibaum, soon engaged an attorney to help resolve the situation. At this point, Brugnara asserted—for the first time—that the art had been a gift. When Maibaum's attorney attempted to discuss the matter with Brugnara's lawyer, the latter insisted that only four crates had been delivered, along with a smaller box. He also indicated that Brugnara would be willing to return the art "in exchange for something."

Once negotiations for the art's return stalled, the case was referred to the Federal Bureau of Investigation (FBI). The FBI searched Brugnara's home in May 2014 and recovered four of the crates from the garage, none of which appeared to have been opened. The fifth crate, which Long testified contained a bronze casting of Edgar Degas's Little Dancer statue, was not recovered and remains missing.

Brugnara was detained pending trial, but the district court granted him furloughs starting in late 2014 to meet with his attorney at the federal court buildings in Oakland and San Francisco for trial preparation. During one of these meetings in February 2015, Brugnara escaped from the building and fled on foot. He was apprehended several days later in Los Gatos, California. The government added several new charges against Brugnara after this incident, bringing the total to nine: four counts of wire fraud, one count of mail fraud,

two counts of false declaration before a court, one count of escape, and one count of contempt of court.

Brugnara's flight also created turbulence with respect to his representation when he asserted that his attorney had "green-lighted" the escape. This lawyer withdrew for ethical reasons, and the lawyer who took his place also withdrew shortly after being appointed. At that point, Brugnara decided to represent himself at trial. The district court held a thorough two-day *Faretta* hearing and found that Brugnara was competent to represent himself and that he was knowingly and voluntarily waiving his right to counsel. The judge therefore granted the request to proceed pro se.

From the moment his trial began, Brugnara's behavior could be described as appalling. He quickly dispensed with procedural and evidentiary requirements during his examinations by making speeches and asking improper "questions" designed to place inadmissible evidence before the jury. If the government attorneys objected, Brugnara would speak over them and interrupt the judge when he tried to make a ruling. Brugnara shouted down attempts to rein him in on several occasions.

In addition to these procedural affronts, Brugnara was not shy about personally insulting those around him. Some of the more egregious examples include telling the government's attorney that she dressed "like a Nazi" and suggesting that the judge hand the prosecutor his robe because she was running the courtroom. Nor did he limit his scorn to the government and district judge: he berated witnesses, too. During his cross-examination of Long, for example, he rudely asked her over and over again if her cognitive abilities were impaired. He also demeaned a probation officer as unqualified for her job

because she did not know the difference between a corporate officer and a shareholder.

In addition to this insulting behavior, Brugnara was prone to throwing tantrums when things did not go his way. An illustrative example occurred following his cross-examination of one of the government's witnesses, a commercial mortgage broker who had previously helped Brugnara obtain financing on various real estate projects. When Brugnara asked if he would still be able to obtain financing through the witness's company if he were acquitted, the witness responded emphatically in the negative. Brugnara then stumbled through several improper, thinly-veiled attempts to convince the witness to change his answer, only to have the witness say, in front of the jury, that he would have a better chance of "successfully doing brain surgery" than placing a loan for a museum of which Brugnara would be the landlord and tenant. After the cross-examination ended, the jurors and witness were barely out of the courtroom before Brugnara launched into a top-of-his-lungs tirade about how he had built himself up from nothing and accusing the government and the court of costing him his business relationship. The situation quickly deteriorated and Brugnara had to be escorted from the courtroom.

Throughout all of this, the district judge managed the trial as best he could. He sanctioned Brugnara with summary contempt on several occasions when his behavior became too outrageous. In all, the district judge held Brugnara in summary contempt more than a dozen times and punished him with a total of 471 days in prison to be added onto whatever sentence might be imposed in the event Brugnara were convicted.

Partway through the trial, a jail official ordered that Brugnara be moved because his constant complaints about the confinement conditions required jail personnel to make frequent trips to court to testify, burdening the jail's operations. Personnel at the jail where Brugnara was housed put all of his possessions in bags, including his legal materials, to move him to a different facility. The district court admonished the official for moving Brugnara and disorganizing his legal papers in the middle of trial, but found that there was no intent to interfere with Brugnara's self-representation. The trial moved forward when Brugnara refused the court's offers of a continuance to reorganize his materials, indicating unequivocally that he did not want to delay the proceedings.

Jury deliberations were no less dramatic than the rest of the trial. The jury informed the court in a note that one of the jurors had been untruthful about his criminal history during voir dire and was attempting to influence the discussion based on his experience as a prisoner. The same juror had also reportedly bolted from the jury room in the midst of deliberations, only to be found on another floor of the courthouse.

The district judge summoned the juror, identified as I.J., into the courtroom to inquire into his behavior. When the judge asked about his criminal history, I.J. became irate and commenced what the judge described as a "relentless political tirade." Court security personnel had to remove I.J. from the courtroom when he became physically belligerent, including whipping his jacket against the seats of the jury box and taking off his shoe and brandishing it like a weapon. When I.J. returned to the courtroom so that the judge could dismiss him, he immediately launched into another diatribe,

proclaiming that Brugnara was innocent because "[h]e is Italian" and accusing the judge of "represent[ing a] Nazi system." The judge then dismissed I.J. from the jury and ordered him removed from the building. Throughout this episode, Brugnara objected to I.J.'s removal and fought to keep him on the jury. The remaining jurors and the alternate juror who took I.J.'s place ultimately convicted Brugnara of six of the nine counts with which he was charged.

The district judge appointed counsel for all post-trial proceedings at Brugnara's request. Brugnara subsequently tried to return to pro se status, but the judge held that Brugnara had forfeited that right with his aberrant behavior during trial. Brugnara's appointed counsel filed two post-trial motions: one for judgments of acquittal on the mail fraud, wire fraud, and false declaration charges, and one for a new trial. The latter motion alleged that Brugnara had been deprived of a fair trial because (1) the district judge improperly prevented Brugnara from asking a witness, who was arguably an art expert, about the art's value; (2) he was denied access to his legal materials during trial; (3) the district court failed to terminate his self-representation even though he could not control his behavior; and (4) one of the jurors, C.D., did not answer voir dire questions about her criminal history truthfully. When post-trial valuations revealed that the art at issue was worth substantially less than Long had advertised, Brugnara's counsel supplemented the new trial motion to argue that the valuations were newly discovered evidence that warranted a second trial. The district judge denied both motions in a comprehensive order.

At sentencing, Brugnara's counsel moved for a competency hearing and mental evaluation of his client. Although the district judge had rejected a similar suggestion

by Brugnara's advisory counsel on the third day of trial, he ordered briefing on the issue at sentencing after appointed counsel supported his request with an expert's declaration. The expert's declaration did not persuade the judge, however, and he denied the motion after finding that Brugnara could understand the nature of the proceedings against him and was able to assist in his own defense. After a lengthy allocution by Brugnara, the court sentenced him to eighty-four months in prison. Brugnara now appeals.

II.

Brugnara argues first that the district court should have granted his new trial motion based on the newly discovered valuation evidence. "We review a district court's order denying a motion for a new trial made on the ground of newly discovered evidence for abuse of discretion." *United States v. Hinkson*, 585 F.3d 1247, 1259 (9th Cir. 2009) (en banc). This analysis involves a two-step process. First, we must "determine de novo whether the trial court identified the correct legal rule to apply to the relief requested." *Id.* at 1261–62. If it did, then we must "determine whether the trial court's application of the correct legal standard was (1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" *Id.* at 1262, *quoting Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 577 (1985).

In this context, the correct legal rule is that a defendant is entitled to a new trial based on newly discovered evidence only when he can show the following:

(1) [T]he evidence is newly discovered;
(2) the defendant was diligent in seeking the

> evidence; (3) the evidence is material to the
> issues at trial; (4) the evidence is not
> (a) cumulative or (b) merely impeaching; and
> (5) the evidence indicates the defendant would
> probably be acquitted in a new trial.

*Id.* at 1264. Brugnara does not argue that the district judge misidentified this rule, and indeed he did not. Accordingly, only the second part of the test is at issue: whether the district judge applied the rule illogically, implausibly, or without support in the record. We hold that he did not because Brugnara was not diligent in seeking the valuation evidence.

The record shows that Brugnara believed (or at least asserted) that the art was worthless both before and during trial, yet he made only minimal efforts to have it valued independently. He filed two pro se motions requesting valuations six months before trial, both of which the district court denied as improper because he was represented by an attorney at that time. His then-lawyer also filed a motion to appoint Sotheby's and Christie's to value the art, but the district court denied it because neither auction house was willing to be appointed. In that same order, the court advised Brugnara to follow the Criminal Justice Act (CJA) expert appointment procedure if he wanted an expert provided to appraise the art. There is no indication that Brugnara even attempted to avail himself of this procedure until after trial.

It is not uncommon that a party fails to act diligently when he does not take advantage of reasonably available means to obtain known or suspected evidence before or at least during trial. In *Hinkson*, for example, the defendant sought a new trial on the basis of affidavits from military personnel confirming that a key prosecution witness had

testified falsely about his service record. 585 F.3d at 1257. We affirmed the district court's finding that the defendant did not act with diligence because he did not obtain the affidavits until a month after trial, even though he learned three months *before* trial that the witness was only sixteen years old at the end of the Korean War, in which he claimed to have served. *Id.* at 1265. The defendant further showed a lack of diligence by not seeking a continuance at trial to obtain the affidavits after the district court suggested that the proof they contained "was precisely the evidence . . . [that] might help it understand [the witness's] true military record." *Id.* Thus, the defendant was not diligent because he did not use available means to obtain the evidence in time to use it at trial.

For the same reason, we affirmed the denial of a motion for a new trial in *United States v. George*, 420 F.3d 991 (9th Cir. 2005). The defendant in that case, who was charged with willfully filing false tax returns, had served as a court-appointed receiver for five radio stations, and he argued that receivership returns for two of those stations showed that a prosecution witness had given false material testimony. *Id.* at 994, 1000. But his "failures to subpoena [the witness] before trial or contact the California State Franchise Tax Board to obtain copies of the radio stations' state returns suggest[ed] that [he] was not diligent." *Id.* at 1000–01. In *United States v. Kulczyk*, 931 F.2d 542 (9th Cir. 1991), we affirmed the district court, concluding that a defendant was not diligent in finding two known witnesses because he failed to "inform the judge before or at least during the trial that he was unable to locate [them]." *Id.* at 548–49.

Like the defendants in those cases, Brugnara showed a lack of diligence here by waiting until after he was convicted to obtain the valuation evidence, even though the court called

his attention before trial to the possibility of a Criminal Justice Act (CJA) expert appointment. That Brugnara represented himself does not compel a contrary conclusion: there is no evidence that his pro se status prevented him from utilizing the CJA process, and in any event the district court fully apprised him of the difficulties associated with engaging an expert from jail. Brugnara thus chose to represent himself fully advised, and he may not now complain that the challenges the district court warned him about in fact came to pass. Accordingly, it was not an abuse of discretion for the district judge to deny his new trial motion.

## III.

Brugnara next contends that there was not enough evidence to sustain his mail fraud, wire fraud, and false declaration convictions. We review evidentiary insufficiency claims de novo and findings of fact for clear error. *United States v. Overton*, 573 F.3d 679, 685 (9th Cir. 2009). "Evidence is sufficient to support a conviction unless, viewing the evidence in the light most favorable to sustaining the verdict, no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* In other words, we must first presume that the trier of fact resolved any conflicting inferences from historical facts in favor of the prosecution, and then determine whether the evidence, thus viewed, could have led *any* rational fact-finder to find the defendant guilty. *United States v. Nevils*, 598 F.3d 1158, 1163–64 (9th Cir. 2010) (en banc).

## A.

The elements of mail fraud and wire fraud are essentially identical: the government must show (1) a scheme to defraud,

(2) the use of either the mail or wire, radio, or television to further the scheme, and (3) the specific intent to defraud. *United States v. Jinian*, 725 F.3d 954, 960 (9th Cir. 2013) (wire fraud); *United States v. Rogers*, 321 F.3d 1226, 1229 (9th Cir. 2003) (mail fraud); *see also United States v. Oren*, 893 F.2d 1057, 1060 n.1 (9th Cir. 1990) ("The wire fraud statute is *in pari materia* with the mail fraud statute . . . and is therefore given a similar construction"). Conceding the second element of both offenses, Brugnara argues only that the evidence did not establish the requisite scheme or specific intent to defraud.

The first element covers "any scheme to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *Carpenter v. United States*, 484 U.S. 19, 27 (1987). To be actionable, the misrepresentations must have been material. *See United States v. Woods*, 335 F.3d 993, 998–99 (9th Cir. 2003).

Here, the government provided evidence that Brugnara made at least two knowingly false representations in the course of negotiating the sale: that he would "buy" the art and that he would place it in his museum. Long's and Maibaum's testimony established that both representations were material to the decision to ship the art to Brugnara. Furthermore, Brugnara refused to pay for shipping or provide a deposit. From these facts, a rational fact-finder could have determined that Brugnara had a scheme to obtain the art without paying for it, and that his misrepresentations were part of that scheme.

The third element, Brugnara's specific intent to defraud, "may be established by circumstantial evidence." *Rogers*, 321 F.3d at 1230. A rational jury could have inferred such

intent from Brugnara's "statements and conduct." *United States v. Beecroft*, 608 F.2d 753, 757 (9th Cir. 1979). He offered to "buy" the art when he knew that he had no money to do so and place it in a museum that he knew did not exist. Coupled with his unusual refusal to provide a down payment before delivery, these willful misrepresentations support a finding of intent to defraud.

Brugnara's actions after the delivery only bolster this determination. *See Rogers*, 321 F.3d at 1230 (concluding that intent to defraud could be inferred from after-the-fact misrepresentations designed to cover up fraudulent conduct). For instance, despite Long's repeated urging, Brugnara refused to inspect the art and made excuses not to do so. Once Long and Maibaum involved their lawyers, Brugnara asserted, without support, that the art had been a gift. He also created confusion as to the number of crates that had been delivered. A rational jury could have viewed these as attempts to avoid paying for the art. Such a jury also could have construed Brugnara's offer to return the art "in exchange for something" as a type of ransom. This is more than enough evidence from which the jury could have found rationally that Brugnara had the specific intent to defraud.

We are not persuaded by Brugnara's arguments to the contrary. He contends that Long was actually trying to defraud him by selling him fake art, which, he contends, precludes a finding of fraud on his part. But Long's alleged conduct, even if true, has no bearing on the elements of Brugnara's crimes. It is not material who approached whom or whether she intended to defraud him. Long's actions do not change the fact that Brugnara knowingly made false representations meant to deprive her and Maibaum of their property.

His second argument—that the government's case hinged on the disappearance of the Little Dancer, which he contends is conversion rather than fraud—is rejected. The government put forward evidence of Brugnara's numerous false statements and other conduct to show his scheme and intent to defraud. Although the Little Dancer's disappearance was a component of that evidence, it was not shown to be the linchpin of the case. The government still would have had adequate evidence of Brugnara's fraud even if the statue had not disappeared. At best, this argument shows that, in addition to fraud, Brugnara or someone else might *also* be guilty of conversion.

We therefore hold that sufficient evidence supports Brugnara's convictions for wire fraud and mail fraud.

### B.

Brugnara also challenges the sufficiency of the evidence supporting his false declaration conviction. The false statement for which he was convicted was his assertion, during a supervised release revocation hearing, that a Sotheby's representative had told him that some of the art at issue was not authentic. He now argues that the jury was given too little information about the purpose of that hearing to have rationally concluded that the statement was material to the decision being made. While the evidence on this point could have been stronger, we hold that it was constitutionally sufficient to sustain his conviction.

The crime of false declaration before a court is comprised of five elements: the defendant "(1) knowingly ma[d]e a (2) false (3) material declaration (4) under oath (5) in a proceeding before or ancillary to any court of the United

States." *United States v. McKenna*, 327 F.3d 830, 838 (9th Cir. 2003), *citing* 18 U.S.C. § 1623(a). As indicated, Brugnara contests only the sufficiency of the evidence supporting the third element, materiality of the statement. "A statement is material if 'it has a natural tendency to influence, or was capable of influencing, the decision of the decision-making body to which it was addressed.'" *Id.* at 839, *quoting United States v. Leon-Reyes*, 177 F.3d 816, 820 (9th Cir. 1999). This lenient standard is met as long as the false statement is "relevant to *any* subsidiary issue under consideration." *Id., quoting United States v. Lococo*, 450 F.2d 1196, 1199 (9th Cir. 1971) (emphasis added).

The government points to two items of evidence that it argues support the jury's finding of materiality. The first is the district judge's prefatory explanation to the jury, before the government read Brugnara's false statement into evidence, that Brugnara made the statement as part of "prior proceedings in this case." The second is the judge's question during the revocation hearing, which followed up on the false statement, concerning the identity of the person at Sotheby's with whom Brugnara had purportedly spoken. Viewed in the light most favorable to sustaining the verdict, this evidence could rationally support a finding that Brugnara's false statement was material beyond a reasonable doubt.

As a threshold matter, however, there is a potential problem with the first piece of evidence. The district judge's statement, by itself, is not competent evidence, as "[t]he presiding judge may not testify as a witness at the trial." Fed. R. Evid. 605. Furthermore, no objection is required to preserve this issue. *Id.* No party has raised an argument on this point, however, so it may be waived. *See Indep. Towers of Wash. v. Washington*, 350 F.3d 925, 929 (9th Cir. 2003)

("Our circuit has repeatedly admonished that we cannot 'manufacture arguments for an appellant' and therefore we will not consider any claims that were not actually argued in appellant's opening brief").

Even if not waived, the judge's announcement of this fact in evidentiary fashion does not warrant reversal. We generally review issues that were not brought to the district court's attention for plain error. Fed. R. Crim. P. 52(b). Because objecting to a presiding judge's alleged testimony during trial is not required to preserve the issue, however, we will employ the more lenient harmless error standard without holding that it necessarily applies in a situation such as this. *See* Fed. R. Crim. P. 52(a).

The district judge's statement that Brugnara's false declaration occurred during a prior proceeding in the case was nothing more than a description of the court's own records, of which a district court may properly take judicial notice. *See* Fed. R. Evid. 201(b); *Kelly v. Johnston*, 111 F.2d 613, 614–15 (9th Cir. 1940). When taking judicial notice, however, a court must announce that it is doing so on the record to ensure that the parties have an opportunity to be heard upon request. *United States v. Lewis*, 833 F.2d 1380, 1385 (9th Cir. 1987); *see also* Fed. R. Evid. 201(e). The district judge did not do that here. But that error did not affect Brugnara's substantial rights because there would have been no colorable basis to exclude the judicially-noticed fact as to when Brugnara made the statement. Accordingly, the jury could properly consider that evidence in reaching its verdict.

Taken together, the circumstances under which Brugnara made the false statement and the district judge's follow-up question are enough to sustain the false declaration

conviction. The jurors knew from the trial itself that the art's authenticity was a "subsidiary issue" at minimum in the case, and therefore rationally could have inferred that it was so in the case's prior proceedings. The follow-up question only bolsters this inference. Viewed in the light most favorable to the prosecution, that question implies that the judge considered the information relevant to the proceeding at hand. We acknowledge that asking a question in response to a statement does not *necessarily* mean that the judge considered the statement material. But "when 'faced with a record of historical facts that supports conflicting inferences,'" we "must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Nevils*, 598 F.3d at 1164, *quoting Jackson v. Virginia*, 443 U.S. 307, 326 (1979). Accordingly, we will not disturb Brugnara's false declaration conviction.

IV.

Brugnara points to two alleged procedural violations by third parties that he asserts deprived him of a fair trial. The first concerns the disorganization of his legal materials during trial. Second, he believes that the two jurors' untruthful responses regarding their criminal histories during voir dire undermined the jury's impartiality.

A.

We begin with the access to legal materials claim. The parties disagree on the applicable standard of review, but we need not reach this issue because Brugnara was not denied reasonable access to his legal materials under any standard.

The Sixth Amendment requires that an incarcerated pro se defendant be given "reasonable access to 'law books, witnesses, or other tools to prepare a defense.'" *United States v. Sarno*, 73 F.3d 1470, 1491 (9th Cir. 1995), *quoting Milton v. Morris*, 767 F.2d 1443, 1446 (9th Cir. 1985). "The right of access is not unlimited, but must be balanced against the legitimate security needs or resource constraints of the prison." *Id.* In imposing restrictions on this access, the government "may not unreasonably hinder the defendant's efforts to prepare his own defense." *Milton*, 767 F.2d at 1446–47.

We reject Brugnara's argument because there is no evidence that he was denied any access to his legal materials. The record shows only that prison personnel disorganized them when they placed them in plastic bags before moving him to a new facility. While undoubtedly inconvenient, this action did not prevent Brugnara from actually *accessing* those materials. He has not shown that any materials were lost or withheld, or that prison authorities otherwise impeded his access to them. In fact, he has identified no specific prejudice at all, such as not being able to locate a particular document necessary for trial preparation. He merely asserts, without elaboration, that the record shows he was "irreparably prejudiced."

In addition, Brugnara's staunch refusal to accept the district court's offers for a continuance to reorganize his materials makes his argument difficult to credit. More importantly, though, the mere disorganization of Brugnara's legal materials, without evidence of bad faith or resulting prejudice that amounts to the deprivation of access, is not enough to make out a constitutional violation. His argument to the contrary does not comport with our cases approving

significant restrictions on access itself. In one case, for instance, we held that limiting a pro se defendant to one-sixth of the legal materials he possessed did not unreasonably curtail his materials access. *See United States v. Robinson*, 913 F.2d 712, 717–18 (9th Cir. 1990). Brugnara, by contrast, has not shown that he was denied *any* access to his legal materials, let alone reasonable access. We hold, therefore, that the prison officials' actions did not violate Brugnara's Sixth Amendment right.

## B.

Next, Brugnara contends that he was deprived of his right to trial by an impartial jury because jurors I.J. and C.D. did not truthfully answer questions about their criminal histories during voir dire.

The argument concerning I.J. is the easiest to address because Brugnara has waived it. Not only did Brugnara actively seek to keep I.J. on the jury after his criminal history came to light (and after the outburst that immediately preceded I.J.'s removal from the jury), but he also failed to mention I.J. in either his new trial motion or its supplement. "Issues not presented to the district court cannot generally be raised for the first time on appeal." *United States v. Robertson*, 52 F.3d 789, 791 (9th Cir. 1994). Although there are narrow exceptions to this rule, *id.*, none applies here. Brugnara has therefore waived this issue, and we will not consider it.

The government believes that Brugnara has also waived his argument with respect to C.D. because the district court found that he learned about her criminal record during deliberations but said nothing until he moved for a new trial.

While the record shows that a private investigator told Brugnara's advisory counsel about C.D.'s criminal history the day before the verdict, there is no direct evidence that Brugnara himself knew about it. In denying the new trial motion, the district judge concluded that Brugnara's knowledge could be inferred because it was reasonable to believe that advisory counsel communicated the information to Brugnara, a determination that Brugnara contests. We need not resolve this dispute because Brugnara has not shown any juror bias requiring reversal.

The Sixth Amendment guarantees a criminal defendant the right to a trial by impartial jurors. *United States v. Simtob*, 485 F.3d 1058, 1064 (9th Cir. 2007). The presence of even one biased juror affects that right. *Id.* Juror bias comes in three forms: actual, implied, and *McDonough* bias. *United States v. Olsen*, 704 F.3d 1172, 1189 (9th Cir. 2013). With regard to C.D., Brugnara argues only the third.

A defendant must make two showings to obtain a new trial based on *McDonough* bias: first, that the juror in question "failed to answer honestly a material question on *voir dire*," and second, "that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). Only concealment for "reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id.*

Assuming, without deciding, that C.D. failed to answer a material voir dire question honestly, Brugnara still does not succeed on the second part of the test because a truthful answer would not have provided a valid basis to challenge her for cause. *Cf. Elmore v. Sinclair*, 799 F.3d 1238, 1253 (9th

Cir. 2015) (holding that state supreme court did not unreasonably dismiss juror bias claim where juror "likely could not have been removed for cause" even if a truthful answer would have been material). C.D.'s criminal record consisted of a few misdemeanor convictions and one drug possession charge without a record of disposition. None of these convictions would automatically disqualify her from serving on the jury, and there is no evidence as to why she did not answer truthfully because the defense failed to raise the issue until after trial. As a result, the record does not show that Brugnara could have validly challenged C.D. for cause if she had answered truthfully, a point he effectively concedes by arguing only that an honest response would have prompted further inquiry and *may* have led to a challenge for cause. Accordingly, we hold that C.D.'s presence did not violate Brugnara's right to an impartial jury.

## V.

The final pair of arguments concerns Brugnara's ability to represent himself. He contends both that the district judge should have terminated his self-representation when it became clear that he could not control his behavior, and that the district judge should have held a competency hearing, either *sua sponte* during trial or at counsel's request during sentencing.

## A.

A criminal defendant's right to represent himself is not absolute. In *Faretta v. California*, 422 U.S. 806 (1975), the Supreme Court made it clear that a trial judge has discretion to terminate an unduly disruptive defendant's self-representation. *Id.* at 834 n.46. The Court has also held that

a state may constitutionally impose a lawyer on a criminal defendant who is competent to stand trial but not to defend himself. *Indiana v. Edwards*, 554 U.S. 164, 167 (2008). Brugnara seeks to extend those principles, arguing that the district court was *obligated* to terminate his self-representation in light of his behavior at trial.

1.

Criminal defendants have a constitutional right under *Faretta* to defend themselves, as long as they knowingly and voluntarily waive their right to counsel. 422 U.S. at 835. This is not a license to disrupt proceedings, however. Indeed, the Supreme Court has warned that a "trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." *Id.* at 834 n.46. Although this language appears discretionary on its face, Brugnara insists that it required the district judge in this case to rescind his pro se status to preserve his right to a fair trial. We disagree.

First, if the Supreme Court meant to impose a termination requirement in *Faretta*, the cited footnote was an odd way to do it. As mentioned, the Court used discretionary rather than mandatory language to explain trial judges' authority in this respect, saying only that a judge "*may* terminate" an unruly defendant's self-representation. *Id.* (emphasis added). A constitutional requirement surely would have warranted more imperative language. Furthermore, the Court followed up this limitation on the right to self-representation by proscribing ineffective assistance of counsel claims by pro se defendants. *See id.* It would make little sense to close one avenue of relief for a self-represented defendant's poor lawyering only to

open up another *sub silentio*. The footnote itself thus offers little support for Brugnara's reading.

Second, Brugnara's interpretation is directly in opposition to the reasoning underlying the *Faretta* right itself. The Supreme Court went to great lengths in that case to explain that a criminal defendant's choice to represent himself must be respected even if he "conduct[s] his own defense ultimately to his own detriment." *Id.* at 834. Our court has likewise recognized that the right to self-representation "merits the same vigilant protection as other constitutional rights," even though it "is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant." *United States v. Gerritsen*, 571 F.3d 1001, 1008 (9th Cir. 2009), *quoting McKaskle v. Wiggins*, 465 U.S. 168, 177 n.8 (1984). Accordingly, "we cannot ignore or diminish the importance of this right merely because the defendant's efforts at trial were unsuccessful. Nor may we second-guess, after the fact, whether the defendant would have been better served by counsel." *Id.* at 1008–09.

The lesson of these cases is that a defendant cannot be denied his right to self-representation just because he may defend himself poorly or inadequately. *See United States v. Flewitt*, 874 F.2d 669, 673–74 (9th Cir. 1989) (holding that district court erred when it terminated self-representation because defendants "would not properly prepare for trial"); *see also id.* at 674 ("If [a defendant] chooses to defend himself, he must be content with the quality of that defense"). Brugnara's position—that the district court should have stepped in to protect him from his own poor judgment—is antithetical to this reasoning. Boorish and rebellious behavior is precisely what the Supreme Court had in mind when it prohibited pro se defendants from seeking reversals of their

convictions on the basis of their own errors. *See Faretta*, 422 U.S. at 834 n.46.

We therefore hold that *Faretta* means exactly what it says: a trial court is permitted, but not required, to terminate an incorrigible pro se defendant's self-representation. The district court's decision to allow Brugnara to represent himself "ultimately to his own detriment" did not violate his right to a fair trial. *Id.* at 834.

2.

We turn now to Brugnara's *Edwards* claim. In *Edwards*, the Supreme Court held that a state may constitutionally insist that a defendant be represented when he is competent to stand trial but not to defend himself. 554 U.S. at 167. Animating that decision was a concern that permitting the defendant to represent himself when he lacked the competency to do so would "undercut[] the most basic of the Constitution's criminal law objectives, providing a fair trial." *Id.* at 176–77. The Court also worried that allowing such a defendant to proceed pro se would undermine the trial's public appearance of fairness. *Id.* at 177.

Brugnara's argument that *Edwards* imposes a duty to terminate self-representation is stronger than his *Faretta* claim. The problems just mentioned exist whenever an incompetent defendant represents himself, not just when a state insists that he be represented by counsel. Therefore, the fairness of a trial in substance and appearance hinges solely on whether a defendant is in fact competent to represent himself, without regard to whether the state takes action to impose counsel. We do not reach this issue, however, because Brugnara has not shown himself to be in the *Edwards* class of

defendants who "suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Id.* at 178.

At sentencing, the defense's psychologist submitted a declaration in which he opined that Brugnara likely suffers from bipolar disorder, delusional disorder, and narcissistic personality disorder. At the same time, he admitted that Brugnara "demonstrate[s] high-average, nearly superior intellectual ability." This is a far cry from the defendant in *Edwards*, who suffered from schizophrenia, was more than once found incompetent to stand trial, and filed at least one undecipherable document that ostensibly described his "version" of the relevant events. *Id.* at 167–69, 179. Brugnara also differs greatly from the defendant in *United States v. Ferguson*, 560 F.3d 1060 (9th Cir. 2009), where we reversed a conviction on *Edwards* grounds. In *Ferguson*, the defendant "did absolutely nothing" at trial and "submitted three nonsensical motions, did not object to the [pre-sentence report], and did not make any legal arguments" at sentencing. *Id.* at 1069.

Instead, this case more closely resembles *United States v. Johnson*, 610 F.3d 1138 (9th Cir. 2010), where we held that the defendants did not even "get through the door to making an *Edwards* claim at all, because they were clearly fully competent, albeit foolish, to represent themselves." *Id.* at 1145. Like them, Brugnara "gave [an] opening statement[], . . . examined and cross-examined witnesses, challenged jury instructions, and delivered [a] closing argument[] of significant length." *Id.* at 1146. Throughout the trial, he asked coherent questions and made rational arguments—the only flaw was that his legal theory of the case was wrong. At most, Brugnara's afflictions, such as they are, make him rude and

impulsive; they do not rise to the level of a "severe mental illness" precluding competent self-representation. *Edwards*, 554 U.S. at 178. The district court's finding that Brugnara was competent to represent himself was therefore not clearly erroneous. *See Johnson*, 610 F.3d at 1145 ("We review the district court's factual finding that the defendants were competent to represent themselves for clear error").

Accordingly, the district court did not deny Brugnara a fair trial by allowing him to represent himself for the duration of the proceeding. This holding also disposes of his request to reverse the contempt citations, since he argues only that they were improper because he should not have been allowed to represent himself in the first place.

### B.

Relatedly, Brugnara argues that he was entitled to a competency hearing at some point during proceedings in the district court. When deciding whether a district court should have held a competency hearing pursuant to 18 U.S.C. § 4241(a), we review the record "to see if the evidence of incompetence was such that a reasonable judge would be expected to experience a genuine doubt respecting the defendant's competence." *United States v. Dreyer*, 705 F.3d 951, 960 (9th Cir. 2013), *quoting United States v. Marks*, 530 F.3d 799, 814 (9th Cir. 2008).

A district court must hold a competency hearing, *sua sponte*, if necessary, when "there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist

properly in his defense." 18 U.S.C. § 4241(a). Such reasonable cause exists where there is "substantial evidence" in the record indicating that the defendant's mental disease or defect renders him unable to perform either of these functions. *Dreyer*, 705 F.3d at 961.

Brugnara contends that substantial evidence of his incompetency existed both during trial and at sentencing. His ability to understand the nature and consequences of the proceedings in this case is not in dispute. Accordingly, we focus only on whether there was evidence in the record that would cause a reasonable judge genuinely to doubt whether Brugnara could "assist properly in his defense." 18 U.S.C. § 4241(a).

With respect to sentencing, Brugnara relies primarily on the psychologist, who suggested that there were reasons to question Brugnara's competence but never opined that Brugnara was in fact incompetent. Sentencing competency requires that the defendant be "able to understand the nature of the proceedings and participate intelligently to the extent participation is called for." *Dreyer*, 705 F.3d at 961, *quoting Chavez v. United States*, 656 F.2d 512, 518 (9th Cir. 1981). This includes "participating in [the] 'elementary right' of allocution." *Id., quoting Boardman v. Estelle*, 957 F.2d 1523, 1527 (9th Cir. 1992). At his sentencing, Brugnara provided a comprehensive, but rambling, allocution that can only be considered rational and intelligent. He also submitted a handwritten motion setting forth arguments regarding his Sentencing Guidelines calculations and identifying witnesses who could corroborate his explanation of an alleged threat against a prison nurse. By all appearances, Brugnara was capable of assisting in his own defense at sentencing, and in

fact did so. Consequently, the district court was not obligated to hold a competency hearing at that time.

The evidence of incompetency during trial is even scantier, since the subsequent psychological evaluation is minimally probative of Brugnara's condition at trial. *Cf. Williams v. Woodford*, 384 F.3d 567, 608 (9th Cir. 2002) ("[W]e disfavor retrospective determinations of incompetence, and give considerable weight to the lack of contemporaneous evidence of a [defendant's] incompetence to stand trial"). First, there was the advisory counsel's pro forma suggestion on the third day of trial that he would move for a competency hearing if he were representing Brugnara. Although "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense," *Dreyer*, 705 F.3d at 962, *quoting Medina v. California*, 505 U.S. 437, 450 (1992), this particular recommendation has limited value because advisory counsel was not conducting the defense. He thus had little, if any, occasion to assess Brugnara's ability to provide assistance.

The only other evidence bearing on Brugnara's competency at trial was his disruptive conduct, which may well have been the product of strategic calculation rather than any mental defect. In a recorded jailhouse conversation with his mother, Brugnara made the following vow:

> I'm going to bring up everything in court. I'm going to bring up everything. And they may say, oh, you can't hear that. But once it comes out of my mouth, it's already out of my mouth, and the jury hears it. That's the other reason they don't want me to go pro se. I'm

going to say everything I need to say, believe
me.

We hold that a reasonable judge, faced with this record, would not have found it necessary to doubt Brugnara's competency. On the contrary, the evidence reveals that Brugnara's obstinate and pugnacious behavior was nothing more than a deliberate attempt to circumvent the court's rules. This makes him a nuisance, not incompetent. The district court reached a similar determination, and did not err in doing so. There was therefore no need to hold a competency hearing *sua sponte* during trial.

## VI.

Every time the district court gave Brugnara any leeway, he took it and ran with it—literally, on one occasion. He turned what should have been a regular fraud prosecution into a sideshow by upbraiding witnesses, disparaging the judge and government attorneys, and constantly violating basic rules of evidence and procedure, all the while feigning ignorance of proper conduct. Now he points to several alleged errors—largely of his own making—and urges us to vacate his convictions. But Brugnara's bombastic journey through the courts ends here, because none of his arguments persuades us to reverse the jury's verdict. He received a fair trial, and there is enough evidence to support his convictions. We therefore affirm.

**AFFIRMED**.